THE BRANCH BANKING & TRUST COMPANY, PLAINTIFF v. EDWIN
GILL, TREASURER OF THE STATE OF NORTH CAROLINA;
W. G. PARHAM, JR., STATE WAREHOUSE SUPERINTENDENT;
L. C. WOODCOCK; INSURANCE COMPANY OF NORTH AMER-
ICA; AND HARTFORD ACCIDENT AND INDEMNITY COMPANY,
DEFENDANTS

— AND —

HENRY L. STEVENS, III, AND VANCE B. GAVIN, RECEIVERS
OF SOUTHEASTERN FARMERS GRAIN ASSOCIATION, INC.,
AND GREAT AMERICAN INSURANCE COMPANY, THIRD PARTY
DEFENDANTS

No. 123

(Filed 31 January 1975)

1. Trial § 58— nonjury trial — appellate review of findings

When the parties to an action waive a trial by jury and agree
that the judge may hear the evidence and find the facts, the findings
of fact so made by the trial judge are conclusive upon review in an
appellate court if there is competent evidence in the record to support
them, even though the appellate court may deem the weight of evi-
dence to be to the contrary.

2. Trial § 58— nonjury trial — tendered findings of fact

The trial judge in a nonjury trial is not bound to find facts as
proposed by a party, even though there be competent evidence to
support such a finding, and his rejection of the party's tendered find-
ing of fact may not be reversed by the appellate court and is not
ground for a new trial.

3. Warehousemen § 2— issuance of fraudulent warehouse receipts — pro-
moting interest of warehouse — findings of fact

The evidence did not support the trial court's finding that the
plan of the local manager of a grain warehouse to obtain possession
from plaintiff bank of 16 old warehouse receipts issued to a grain associ-
ation of which he was an officer by issuing 13 new fraudulent ware-
house receipts was in no way intended to promote and did not in fact
promote the interest of the grain warehouse where the evidence
showed that the purpose of the fraud on the bank was to obtain the
old receipts so that they could be canceled by the grain warehouse
and a shortage in the warehouse's accounts could be concealed from a
warehouse examiner.

4. Bills and Notes § 7; Uniform Commercial Code § 26— warehouse re-
ceipts — absence of payee's indorsement — no negotiation

A bank was not a transferee of negotiable warehouse receipts by
negotiation and, a fortiori, was not a transferee by due negotiation and
acquired only the title and rights of the payee under the receipts
where the receipts were delivered by the payee to the bank without
the payee's indorsement and where the payee's bookkeeper who sub-
sequently stamped the payee's name upon the reverse side of the

Trust Co. v. Gill, State Treasurer

receipts had neither the authority nor the intent thereby to indorse them in the name of the payee. G.S. 25-7-504(1); G.S. 25-7-501(1), (4).

5. **Principal and Agent § 6— ratification of unauthorized contract**

When an agent, for the purpose of advancing the interests of his principal, makes, without authority, a contract in the name of the principal with another person, and the principal thereafter, with full knowledge of the facts, accepts and retains the benefits resulting from the contract, the principal ratifies the act of the agent and is bound upon the contract as fully as if the agent had originally acted in accordance with his authority.

6. **Principal and Agent § 6; Warehousemen § 2— fraudulent warehouse receipts — ratification by warehouse**

When a grain warehouse, with knowledge through its agent that 16 valid warehouse receipts had been obtained from a bank by the agent's fraudulent issuance of 13 new warehouse receipts for which the warehouse had received no grain, accepted and canceled the 16 old receipts, thus retaining the benefits derived from the unauthorized receipts, it thereby ratified the new receipts and cannot be heard to deny their validity in the hands of the bank.

7. **Warehousemen §§ 1, 3— issuance of fraudulent warehouse receipts — liability of warehouseman, surety, indemnity fund**

Where the local manager of a grain warehouse defrauded a bank by the issuance of warehouse receipts for which no grain had been delivered to the warehouse and the exchange of the fraudulent receipts for valid ones, the local manager and the surety on his bond are primarily liable to the bank for the resulting loss and the State Indemnity and Guaranty Fund is secondarily liable for such loss.

8. **Uniform Commercial Code § 25— variance between words and figures — variance between pounds and bushels**

Uniform Commercial Code provision that "Words control figures except that if the words are ambiguous figures control," G.S. 25-3-118(c), if applicable to warehouse receipts, has no application where the variance in the receipts is between pounds and bushels and the statement of poundage is the same in both words and figures.

9. **Reformation of Instruments § 7— mutual mistake of fact — mistake of draftsman**

Upon the showing of mutual mistake of fact resulting from the error of the draftsman of warehouse receipts in stating the poundage therein incorrectly, the number of bushels having been stated correctly, a court of equity will order the warehouse receipts reformed to express the true intent of the parties to the transaction, nothing else appearing.

10. **Reformation of Instruments § 1— mistake of draftsman — equity power to reform instrument — effect of U.C.C.**

Nothing in the Uniform Commercial Code deprives a court of equity of its power to reform a warehouse receipt so as to correct a mistake of the draftsman.

**11. Equity § 1— clean hands doctrine**

"Clean hands" connotes the absence of sharp practice and bad faith on the part of the party seeking equity, not complete freedom from negligence and gullibility.

**12. Reformation of Instruments § 7— warehouse receipts — mistake of draftsman — clean hands doctrine**

In a transaction in which a bank exchanged 16 valid warehouse receipts for 13 new warehouse receipts which had been fraudulently issued by a warehouse manager to a grain association of which he was an officer so that the valid receipts could be obtained and canceled on the warehouse books and a grain shortage concealed, the evidence and findings were insufficient to support the conclusion that the bank acted in bad faith or engaged in any sharp practice so as to render its hands unclean and bar it from asking a court of equity to reform the new receipts to make them show the correct poundage of grain they represented where the evidence and findings showed only that for a substantial period prior to the transaction, the bank knew of the payee's precarious financial condition, that over such a period the bank had been generous in allowing overdrafts by the payee and making loans to it, and that at the time of the transaction, the bank knew an official examination of the grain warehouse was in progress and that the bank was lax in its inspection and handling of the documents involved.

Justices COPELAND and EXUM took no part in the consideration or decision of this case.

APPEAL by the plaintiff from *Cowper, J.,* at the 18 March 1974 Civil Session of DUPLIN, heard prior to determination by the Court of Appeals.

Branch Banking and Trust Company, hereinafter called the Bank, brought this action to recover $383,900, the value of grain alleged by it to be represented by certain warehouse receipts pledged to it to secure notes made by Southeastern Farmers Grain Association, Inc., hereinafter called Southeastern, or, in the alternative, to recover the amounts due upon the notes, with interest.

The defendant Gill is sued as Custodian of the State Indemnity and Guaranty Fund, which is maintained pursuant to General Statutes Chapter 106, Article 38. The defendant Parham is the State Warehouse Superintendent. The defendant Woodcock was Local Manager of the Farmers Grain Elevator, hereinafter called the Elevator, at the time of the transactions out of which this action arose. The defendant Insurance Company of North America is sued as surety on the bond of Woodcock. The defendant Hartford Accident and Indemnity Company,

hereinafter called Hartford, is sued as surety upon a blanket fidelity bond insuring the State against loss through the failure of any of its employees (including Parham) to perform his duties faithfully.

The Elevator was a unit of the North Carolina State Warehouse System. It operated a grain storage facility at Warsaw, North Carolina. Woodcock, in addition to being Local Manager of the Elevator, was also Secretary-Treasurer of Southeastern and managed its operation. The third party defendants (made so by the complaint of the defendants Gill, Parham, and the two above named surety companies) are the duly appointed receivers for Southeastern and the surety on the fidelity bond of Woodcock for the faithful performance of his duties as Secretary-Treasurer of Southeastern. The third party complaint was dismissed as to Great American Indemnity Company and from that judgment no appeal was taken. No judgment was rendered as to the Receivers of Southeastern.

A jury trial having been waived, the matter came on for hearing before Cowper, J., who received in evidence voluminous oral testimony and documentary exhibits and made the following findings of fact (summarized) :

1. Southeastern engaged in the business of buying and selling grain.

2. Elevator's facilities were owned by Southeastern, leased by it to Parham as State Warehouse Superintendent and operated as a public warehouse for the storage of grain under the provisions of the United States Warehouse Act and the North Carolina Warehouse Law.

4. Woodcock was Secretary-Treasurer of Southeastern and was paid by it alone. He was also duly licensed to act as Local Manager of the Elevator.

5. The Elevator engaged in no activity except the storage of grain.

\*    \*    \*    \*

7. A depositor of grain would, upon request, be issued by the Elevator a negotiable warehouse receipt therefor.

8. Printed and numbered blank warehouse receipt forms, bearing the signature of Parham, were furnished to Woodcock for issuance by him as Local Manager of the

Elevator. In addition to acknowledging the receipt of a specified number of pounds of grain of the described grade and kind, the receipt form provided: *"The State of North Carolina guarantees the integrity of this receipt.* Grade and weight are as determined by an inspector and weigher licensed under the United States Warehouse Act. Said grain is fully insured by the State Warehouse Superintendent against loss or damage by fire, lightning, inherent explosion, tornado, cyclone and windstorm unless expressly stated otherwise hereon." (Emphasis added.)

9. The signature of Woodcock was required on each receipt prior to its issuance. The receipt also stated upon its face in red ink: "The Local Manager [Woodcock] is an employee of Southeastern Farmers Grain Association, Inc."

10. The Bank and Southeastern agreed that the Bank would make loans to Southeastern and that warehouse receipts would be pledged as security therefor.

11. For a substantial time, it was the practice that each receipt so pledged to the Bank bore on its margin a number relating the receipt to the "IN ticket" issued to the depositor of the grain and showing, in pounds, the exact amount of grain deposited and represented by the receipt. Thereafter, prior to the transactions here involved, this practice was discontinued and the pledged receipts were issued for round numbers of bushels, such as 5,000, 10,000 or 20,000 bushels.

12. In 1969, the Bank began habitually to carry substantial overdrafts on Southeastern's checking account, holding such checks for substantial sums for several days until deposits were made to cover them. Such overdrafts reached a high of $212,000 on 17 November 1969.

\*    \*    \*    \*

14. In the Fall of 1969, Craven Brewer (Manager of the Bank's Warsaw Branch) made, on behalf of the Bank, loans to Southeastern substantially in excess of the line of credit authorized for Southeastern by the Bank's Home Office (in Wilson). On 3 February 1970, the loan balance amounted to $634,224 in addition to overdrafts.

\*    \*    \*    \*

16. On 9 February 1970, Warehouse Examiner Flynt went to the Elevator to make a routine examination. Wood-

cock, knowing there was not enough grain in the Elevator to meet the outstanding receipts, instructed the bookkeeper for Southeastern to prepare its check payable to the Bank in the amount of $165,760 and to deliver it to the Bank in exchange for the Bank's surrender of warehouse receipts then held by it as pledgee. This check was an overdraft.

17. The warehouse receipts so obtained by the bookkeeper from the Bank were then canceled. Thereby the shortage of grain in the Elevator in relation to outstanding receipts was eliminated and Warehouse Examiner Flynt completed his examination of the Elevator without discovering this shortage.

18. On the day after the examination by Warehouse Examiner Flynt was completed, Woodcock instructed the bookkeeper of Southeastern to prepare a new note to the Bank in the amount of $71,040 and to pledge to the Bank, as security therefor, six new warehouse receipts, issued by the Elevator to Southeastern for 10,000 bushels of grain each, no new grain having been received by the Elevator to justify the issuance of such new warehouse receipts. By reason of such new notes, the Bank credited the checking account of Southeastern with sufficient funds to make Southeastern's above mentioned check to the Bank in the amount of $165,760 good.

19. From 10 February 1970 to 5 May 1970, Woodcock caused the Elevator to deliver for the account of Southeastern quantities of grain far in excess of the amount actually stored in the Elevator by Southeastern.

20. On 5 May 1970, Warehouse Examiner Brown arrived at the Elevator to make another routine check of the grain storage operation. Woodcock then knew that due to the shipments so made on account of Southeastern there was not sufficient grain in the Elevator to meet the outstanding warehouse receipts.

21. At the opening of business on 5 May 1970, the Warsaw Branch of the Bank held demand notes of Southeastern, secured by 19 warehouse receipts issued by the Elevator to Southeastern, in the total face amount of $545,424. Six of these pledged receipts were the receipts referred to in Finding No. 18.

22. During the morning of 5 May 1970, Woodcock caused Southeastern's check, drawn on sufficient funds, to be delivered to the Bank in exchange for its surrender of two of the pledged receipts, which were thereupon canceled on the books of the Elevator. This left in the hands of the Bank 17 warehouse receipts issued by the Elevator to Southeastern, including the six referred to in Finding No. 18. The grain for these 17 receipts had previously been shipped out by the Elevator, on the account of Southeastern, without requiring the surrender of such receipts for cancelation.

23. On the afternoon of 5 May 1970, Woodcock went to the Bank and requested it to release to him some of the 17 receipts so held by the Bank, informing the Bank that the Warehouse Examiner was then at the Elevator and stating that the warehouse receipts were needed for the examination.

24. The Bank refused to release the receipts until the loans which they secured were paid. Woodcock then offered to give the Bank a check, which would have been an overdraft, but the Bank refused to surrender the receipts in exchange for such check. Woodcock and the Bank then agreed to negotiate a new loan by the Bank to Southeastern which would be secured by new receipts and which loan would provide the funds needed to make good a check given to pay the existing loans secured by the 17 receipts above mentioned.

25. On the morning of 6 May 1970, pursuant to the instructions of Woodcock, the bookkeeper of Southeastern prepared two notes made by Southeastern payable to the order of the Bank in the total amount of $307,840, a deposit slip for that amount, and 13 new warehouse receipts issued by the Elevator to Southeastern. She then also prepared Southeastern's check payable to the Bank in the amount of $328,952.

26. About noon on 6 May 1970, the bookkeeper of Southeastern, pursuant to the instructions of Woodcock, delivered the above papers to the Bank's note teller.

27. The balance in Southeastern's checking account at the close of business on 6 May 1970 was, in addition to the amount of the above mentioned new notes, sufficient to make the above mentioned check good.

28. On 6 May 1970, upon receipt of the above mentioned new notes, new warehouse receipts, deposit slip and check, the Bank's note teller surrendered to Southeastern's bookkeeper 16 of the warehouse receipts previously pledged to the Bank, but retained the notes secured thereby because the check so delivered to the Bank by Southeastern did not cover the accrued interest on the notes.

29. Shortly after the bookkeeper of Southeastern left the Bank with the surrendered warehouse receipts, the Bank's note teller discovered that the new warehouse receipts delivered as security for the new notes had not been endorsed by Southeastern. She telephoned the bookkeeper of Southeastern and requested that the new receipts be endorsed.

30. A resolution of the directors of Southeastern, a copy of which had been delivered to the Bank, required for a valid endorsement the signatures of both the President and the Secretary-Treasurer (Woodcock) of Southeastern.

31. On every prior occasion endorsement of warehouse receipts pledged to the Bank by Southeastern was by the signature of Woodcock.

32. On the morning of 7 May 1970, the bookkeeper of Southeastern went to the Bank and with a rubber stamp placed Southeastern's name on the reverse side of each of the new warehouse receipts so pledged to the Bank. None of these receipts was ever endorsed by the signature of Woodcock or of any other officer of Southeastern. Neither the note teller of the Bank, the bookkeeper of Southeastern nor Woodcock considered the stamping of Southeastern's name upon the receipts a sufficient endorsement thereof by Southeastern.

33. On the afternoon of 7 May 1970, the bookkeeper of Southeastern delivered to the Bank a check for the interest due on the notes which had been secured by the warehouse receipts surrendered by the Bank as above stated.

34. The note teller of the Bank did not process any of the new papers so received by her but held them in anticipation of obtaining Woodcock's endorsement of the new receipts.

35. The new receipts so pledged to the Bank contained an irregularity on the face thereof in that the body of each receipt stated in words that it represented 112,000 pounds of corn, whereas the number of bushels, shown in numerals, was 20,000. One hundred twelve thousand pounds of corn are only 2,000 bushels.

36. During the afternoon of 7 May 1970, Warehouse Examiner Brown's examination of the Elevator disclosed to him a substantial shortage of grain. He thereupon advised Parham of his findings. Parham and an officer of the United States Department of Agriculture then went promptly to Warsaw to confer with Examiner Brown. During their continuing investigation, they learned of the issuance of the new warehouse receipts so delivered to and presently held by the Bank.

37. On the evening of 7 May 1970, Parham advised the Bank that a shortage had been discovered at the Elevator and no further transactions should be entered into by the Bank with Southeastern until further determinations could be made.

38. On Friday, 8 May 1970, Parham conferred with officers of the Bank and discussed with them the findings of the Warehouse Examiner and the 13 warehouse receipts then held by the Bank.

39. On 8 May 1970, officers of the Bank instructed its employees at the Warsaw Branch to continue to hold up the processing of the loan papers of Southeastern, so delivered to the Bank by the bookkeeper of Southeastern on 6 May 1970, until advice of counsel could be obtained.

40. On Monday, 11 May 1970, the Bank proceeded with the processing of the papers, credited the proceeds of its new loan to Southeastern to the checking account of Southeastern and charged against such account the checks so received by it from the bookkeeper of Southeastern covering the principal and interest on the old notes. Immediately thereafter, the Bank closed the checking account of Southeastern and credited the then balance therein against the notes then held by the Bank.

41. The plan whereby Southeastern delivered to the Bank the 13 new, fraudulent warehouse receipts in exchange

for the surrender by the Bank of the 16 old warehouse receipts was not intended to and did not in fact promote the interest of the Elevator. Since Southeastern had already caused the grain represented by these receipts to be delivered by the Elevator, Southeastern was obligated to surrender the receipts for cancelation and when the Elevator obtained possession of such receipts, "it had a perfect right to cancel them on its records." The Elevator did not benefit from the cancelation of these receipts.

42. On 14 May 1970, the Bank demanded of Parham delivery to it of the grain represented by the 13 new receipts then held by it.

\*   \*   \*   \*

44. On 18 August 1970, the Bank demanded of Parham payment of the debt due the Bank from Southeastern, together with interest thereon, and a like demand was made upon the defendant Gill, as Custodian of the State Indemnity and Guaranty Fund.

45. Southeastern was insolvent on 8 May 1970 and its affairs have been placed in the hands of receivers appointed by the Superior Court.

46. The Insurance Company of North America executed a bond in the amount of $100,000 as surety for Woodcock, Manager of the Elevator, conditioned upon the faithful performance by Woodcock of his duties as such Local Manager of the Elevator.

47. Hartford executed, as surety, a bond in the amount of $100,000 for the faithful performance by Parham of his duties as State Warehouse Superintendent.

Upon the foregoing findings of fact, the court concluded: The warehouse receipts now held by the Bank were not negotiated to it within the meaning of G.S. 25-7-501; the warehouse receipts were irregular on their face; the Bank's knowledge of the poor financial condition of Southeastern and of the circumstances surrounding the transaction of 6 May 1970 were sufficient to put it on inquiry as to the "regular course" quality of the transaction; the Bank, having delayed the processing of the new notes secured by the fraudulently issued warehouse receipts, after recieving actual notice of the defenses to such receipts, elected to accept them and to confirm the transaction; the actions

of Woodcock, above recounted, were all designed and entered into solely for the benefit of Southeastern, and the defendants Gill and Parham are not estopped to plead Woodcock's fraud as a complete defense against the Bank; Gill, Parham, the Insurance Company of North America and Hartford, representing the Elevator, have a complete defense against Southeastern and the Bank as to the 13 warehouse receipts now held by the Bank, in that such receipts were improperly and fraudulently issued and did not represent grain on storage in the Elevator; the Bank is not entitled to invoke the equity powers of the court to reform the 13 warehouse receipts so as to have them endorsed effectively or so as to change them to represent 1,120,000 pounds (20,000 bushels) of corn, or to recover the valid warehouse receipts surrendered by it to Southeastern on 6 May 1970, because the Bank does not have clean hands and because such relief would be in conflict with the provisions of Chapter 25 of the General Statutes; the Bank, with full knowledge of the shortage of grain at the Elevator and of the improper issuance of the warehouse receipts, elected to complete the processing of the papers received from the bookkeeper of Southeastern on 6 May 1970, and thus abandoned its rights to rescission and restitution; and the defendant surety companies are not liable to the Bank since Woodcock is not liable to the Bank in his capacity as Local Manager of the Elevator, and Parham is not liable to the Bank in his capacity as State Warehouse Superintendent.

The Superior Court, therefore, adjudged that the plaintiff have and recover nothing of any of the original defendants.

The Superior Court also entered judgment dismissing the action as to the defendant Parham, individually. In this judgment the court found as facts (summarized):

4. Parham, under procedures for operation of the Elevator, "as established by the State of North Carolina and the United States Department of Agriculture," signed warehouse receipt forms in blank and delivered forms so signed to Woodcock, who, under the procedures, would sign the warehouse receipts upon their issuance for grain stored in the Elevator.

5. The procedures followed by Parham were prescribed by the cooperative agreement between the United States Department of Agriculture and the State, the United States

Warehouse Act and the North Carolina Warehouse Law and were in harmony with standard warehouse operating procedures throughout the United States.

6. Parham, individually, made no misrepresentation of fact to the plaintiff upon which the plaintiff relied to its damage. Parham's name, as State Warehouse Superintendent, appeared on all warehouse receipts issued by Woodcock, including the receipts in question in this action.

Upon these findings the court concluded that Parham, individually, was not negligent either in the licensing of Woodcock as Local Manager of the Elevator or otherwise; that he made no misrepresentations of fact to the plaintiff and did not, individually, commit any act, or fail to perform any act, which he had an obligation to perform which resulted in damage or injury to the plaintiff.

From these judgments the Bank has appealed, making 79 assignments of error directed to rulings excluding evidence offered by the plaintiff, to findings of fact, to failure to find facts, to conclusions of law in the two judgments and to the entry of such judgments.

*Carr, Gibbons & Cozart by S. R. Gibbons; Johnson & Johnson by Rivers D. Johnson, Jr., and Dees, Dees, Smith, Powell & Jarrett by William A. Dees, Jr., for Branch Banking & Trust Company.*

*James H. Carson, Jr., Attorney General, by Millard R. Rich, Jr., Assistant Attorney General; Manning, Fulton & Skinner by Howard E. Manning and W. Gerald Thornton for Edwin Gill and W. C. Parham, Jr.*

*Young, Moore & Henderson by J. C. Moore for Insurance Company of North America.*

*Purrington, Hatch & Purrington by A. L. Purrington, Jr., for Hartford Accident and Indemnity Company.*

*Corbett & Fisler by Leon H. Corbett for Individual Defendant Woodcock.*

*Henry L. Stevens III and Vance B. Gavin, Receivers of Southeastern Grain Association, Inc., Third Party Defendants.*

LAKE, Justice.

The Bank's Assignments of Error Numbers 9 to 14, inclusive, are directed to the judgment of the Superior Court dismissing the action against the defendant Parham, individually. These assignments are not brought forward in the Bank's brief, no argument is made and no authorities are cited therein with reference thereto. They are, therefore, deemed abandoned, and, no error appearing on the face of the record concerning it, that judgment is affirmed. Rule 28, Rules of Practice in the Supreme Court; *Capune v. Robbins*, 273 N.C. 581, 590, 160 S.E. 2d 881; *Mathis v. Siskin*, 268 N.C. 119, 150 S.E. 2d 24; Strong, N. C. Index 2d, Appeal and Error, § 45.

By that judgment it is determined that Parham was not negligent in any manner in connection with the operations of the Elevator and that he did not, individually, fail to perform any act, which he had an obligation to perform, which resulted in damages or injury to the plaintiff. The Bank's abandonment of all its assignments of error directed to that judgment makes it unnecessary for us to determine whether it was negligent, or otherwise a breach of Parham's duty, for him to sign warehouse receipts in blank and deliver them over to Woodcock, the Local Manager of the Elevator and also an officer of its principal customer, and thus put it in Woodcock's power to issue such receipts when no grain had been delivered to the Elevator in exchange therefor. We express no opinion upon that question herein.

Parham having been adjudged not negligent and free from any failure to perform his duties resulting in damage to the Bank, it necessarily follows that there was no error in the conclusion of the Superior Court in its other judgment that Hartford, the surety on the bond of Parham for the faithful performance of his duties, is not liable to the Bank or in so much of the second judgment of the Superior Court as adjudges that the Bank recover nothing from Hartford. (Bank's Assignments of Error Numbers 45, 65, 78 and 79.)

The Bank's Assignments of Error Number 1 through 8 relate to rulings of the Superior Court excluding or admitting evidence. We have carefully examined each of these and find no error therein which would justify a new trial of this action. No useful purpose would be served by discussing any of these assignments in detail.

**[1, 2]**   The Bank's Assignments of Error Number 15, in part, and 47 to 72, inclusive, relate to the refusal of the Superior Court to adopt findings of fact tendered by the Bank. When, as in the present case, the parties to an action waive a trial by jury and agree that the judge may hear the evidence and find the facts, the findings of fact so made by the trial judge are comparable to the verdict of a jury. Such findings are conclusive upon review in an appellate court if there is competent evidence in the record to support them, even though the appellate court may deem the weight of the evidence to be to the contrary. *Cogdill v. Highway Comm.*, 279 N.C. 313, 182 S.E. 2d 373; *Fast v. Gulley*, 271 N.C. 208, 155 S.E. 2d 507; *Crews v. Crews*, 210 N.C. 217, 186 S.E. 156; Strong, N. C. Index 2d, Appeal and Error, § 57. Conversely, the weight and credibility of the evidence being for the trial judge in such case, he is not bound to find facts as proposed by a party, even though there be competent evidence to support such a finding, and his rejection of the party's tendered finding of fact may not be reversed by the appellate court and is not ground for a new trial. *Mitchell v. Barfield*, 232 N.C. 325, 59 S.E. 2d 810. Assignment of Error Number 15, insofar as it relates to the court's failure to make findings of fact as tendered by the Bank, and Assignments of Error Numbers 47 to 72, inclusive, are, therefore, overruled.

Assignments of Error Numbers 16 to 36, inclusive, relate to findings of fact made by the Superior Court, the Bank contending that the specified findings are not supported by competent evidence. We have reviewed each such finding and, except as noted below, conclude that there is in the record ample, competent evidence to support each finding made by the Superior Court in all material respects. Under the aforementioned rule, these findings of fact are binding upon us and these assignments of error are, therefore, overruled except as noted below. It would serve no useful purpose to discuss these overruled assignments of error individually.

**[3]**   The Superior Court's Finding of Fact Number 41, Assignment of Error Number 35, is a mixture of findings of facts and conclusions of law. The essence of it is in this sentence: "The plan to obtain possesion of the sixteen old warehouse receipts from the Bank by issuing thirteen new fraudulent receipts was in no way intended nor did it in fact promote the interest of the Farmers Grain Elevator." This is not supported by any evidence

and is clearly in conflict with other findings which are themselves supported by evidence.

At the time Woodcock's plan to obtain the 16 old receipts (the validity of which, in the hands of the Bank, is not questioned by the parties or by the finding of the trial court) was conceived and carried out, the Elevator, not Southeastern, was under official examination. Woodcock, its Local Manager, knew there were outstanding receipts issued by it calling for delivery of thousands of bushels of grain in excess of that in the Elevator. He knew that, if this shortage were discovered by the examiner, the Elevator would be compelled to cease operations. His plan was not designed to reduce and did not reduce the indebtedness of Southeastern or to enable Southeastern to obtain grain by surrendering the receipts obtained from the Bank, or to enable Southeastern to raise cash by further negotiation of the receipts. The purpose of the fraud upon the Bank was to surrender the old receipts to the Elevator for cancelation by it and thus conceal the shortage in the Elevator's accounts from the examiner, whose presence threatened the life of the Elevator. Clearly, the Elevator was the intended beneficiary of the fraud on the Bank and, clearly, it has, by retaining and canceling these receipts, benefited through a substantial reduction of its own liabilities if, as the defendants contend, the new receipts be held invalid.

The net result of Woodcock's fraud, plus the judgment of the Superior Court, is this: The Bank has lost its old note, secured by warehouse receipts, the validity of which, in the hands of the Bank, is not denied, and, in lieu thereof, holds a new note of an insolvent association, secured by worthless paper. Southeastern is neither richer nor poorer than before. The Elevator's obligations to deliver grain have been substantially reduced at no cost to it. Finding of Fact Number 41 is not supported by evidence and must be stricken. The question for us is, Does the law of this State direct the reaching of the above result in the absence of Finding of Fact Number 41?

The Bank, by this action, does not seek the restitution to it of the old note and the old warehouse receipts. In its brief it states:

"The plaintiff does not seek to rescind the loan transaction with Southeastern. The plaintiff has elected to affirm that transaction and has brought suit to recover from the

State Warehouse Superintendent the value of the grain represented by the 13 warehouse receipts which it holds. The burden is upon the State Warehouse Superintendent to make restitution to the appellant of the value of the 16 old receipts if he wishes to avail himself of the plea of fraud as a defense to the 13 new receipts. He cannot keep the benefits of his agent Woodcock's fraud without putting himself in the position of rectifying the validity of the 13 new receipts."

Clearly, the 13 new receipts were issued, in the name of the Elevator, by its agent Woodcock without actual authority in him to do so, no grain having been received by the Elevator in exchange for the receipts. G.S. 106-441; G.S. 106-443. Woodcock was also agent for Southeastern, the payee of the receipts. His knowledge of his own want of authority to issue these receipts is attributed to Southeastern. *Norburn v. Mackie,* 262 N.C. 16, 24, 136 S.E. 2d 279; *Williams v. Lumber Co.,* 176 N.C. 174, 180, 96 S.E. 950. Consequently, the doctrine of apparent authority would not be available to Southeastern and the 13 new receipts were a nullity in the hands of Southeastern. See: *Barrow v. Barrow,* 220 N.C. 70, 16 S.E. 2d 460; 3 AM. JUR. 2d, Agency, § 74. Obviously, had Southeastern retained the 13 new receipts, having received them with full knowledge that no grain had been delivered to the Elevator in exchange for them, Southeastern would have no claim thereon against the Elevator or any of the defendants.

[4] Nothing else appearing, the Bank has no greater right by virtue of these receipts than did Southeastern, since the Bank is not a holder of them by "due negotiation," as that term is defined in the Uniform Commercial Code, G.S. Chapter 25, Part 5. The Code provides:

> *"Rights acquired in the absence of due negotiation; effect of diversion; seller's stoppage of delivery.—*
>
> (1) A transferee of a document, whether negotiable or nonnegotiable, to whom the document has been delivered but not duly negotiated, acquires the title and rights which his transferor had or had actual authority to convey." G.S. 25-7-504(1).

A warehouse receipt is a "document of title." G.S. 25-1-201(15). The receipts here in question were negotiable. G.S. 25-7-104(1)a. "A negotiable document of title is 'duly

negotiated' *when it is negotiated* in the manner stated in this section to a holder who purchases it in good faith without notice of any defense against or claim to it on the part of any person and for value, unless it is established that the negotiation is not in the regular course of business or financing or involves receiving the document in settlement or payment of a money obligation." G.S. 25-7-501 (4). (Emphasis added.) "A negotiable document of title running to the order of a named person is negotiated *by his indorsement* and delivery." G.S. 25-7-501 (1). (Emphasis added.)

. The 13 new warehouse receipts in question were delivered by Southeastern, the payee, to the Bank without Southeastern's indorsement. To be sure, the affixing of the payee's (or subsequent holder's) name upon the reverse side of a negotiable document of title by rubber stamp is a valid indorsement, if done by a person authorized to indorse for the payee and with the intent thereby to indorse. *Mayers v. McRimmon,* 140 N.C. 640, 53 S.E. 447. However, the Superior Court found that Mrs. Carlton, who stamped the name of Southeastern upon the reverse side of these receipts, had neither the authority nor the intent thereby to indorse them in the name of Southeastern. The evidence supports these findings and would support no contrary finding. Therefore, the Bank is not a transferee by negotiation and, *a fortiori,* is not a transferee by due negotiation and, nothing else appearing, acquired the title and rights of Southeastern under the 13 receipts and no more.

It is quite true, as the Bank asserts, that the transferee of a negotiable document of title has a specifically enforceable right to have his transferor supply any necessary indorsement, but it is also true that "the transfer becomes a negotiation only as of the time the indorsement is supplied." G.S. 25-7-506. Thus the Bank's proper demand, through its note teller, upon Southeastern's bookkeeper for indorsement of the receipts would not confer upon the Bank the status of a transferee by due negotiation, and a proper indorsement, after the Bank acquired knowledge of the defect in the instruments, would be equally unavailing.

Since the Bank is not a transferee by negotiation, it is unnecessary for us to determine the correctness of the Superior Court's conclusion that the Bank is not a transferee by due negotiation, for the further reasons that the receipts were irregular upon their face and that the Bank, by reason of its knowledge

of Southeastern's poor financial condition and of the circumstances surrounding the transaction did not take the receipts in the regular course of business, or without notice of defenses.

Obviously, Southeastern, having, through its officer, Woodcock, full knowledge of the facts surrounding the issue of these receipts in the name of the Elevator, could not, if it had retained the receipts, recover anything upon or by reason thereof from any of these defendants. Nothing else appearing, the Bank has no greater rights as transferee of the documents. But, says the Bank, something else does appear, namely, the Elevator received and canceled the old receipts with full knowledge, *via* Woodcock, that they were benefits flowing from the unauthorized 13 new receipts, the fruits of the fraud perpetrated upon the Bank, and thereby the Elevator is estopped to challenge the validity of the 13 new receipts in the hands of the Bank.

Woodcock was the agent of both the Elevator and Southeastern. His knowledge of the plan and the purpose and circumstances of its execution is attributed to both his principals. The situation is, therefore, the same as if the two principals were natural persons dealing with each other with full knowledge of the plan and the circumstances of its execution. The present case is distinguishable from that supposed by the Superior Court in its Finding of Fact Number 41. Had Woodcock's plan to defraud the Bank not been for the purpose of benefiting the Elevator, as, for example, had his purpose been to obtain the old, valid receipts and surrender them for grain or further negotiate them for money for his own use, his knowledge would not be attributable to the Elevator.

[5] When an agent, for the purpose of advancing the interests of his principal, makes, without authority, a contract in the name of the principal with another person, and the principal thereafter, with full knowledge of the facts, accepts and retains the benefits resulting from the contract, the principal ratifies the act of the agent and is bound upon the contract as fully as if the agent had originally acted in accordance with his authority. *Lawson v. Bank,* 203 N.C. 368, 166 S.E. 177; *Sugg v. Credit Corp.,* 196 N.C. 97, 144 S.E. 554; *Parks v. Trust Co.,* 195 N.C. 453, 142 S.E. 473; *Waggoner v. Publishing Co.,* 190 N.C. 829, 130 S.E. 609; *Bank v. Justice,* 157 N.C. 373, 72 S.E. 1016.

[6] The Elevator, with full knowledge of the issuance of the 13 new receipts though no grain had been delivered to it there-

for, accepted the old receipts, upon which it was liable to the Bank, and canceled them. It still retains this benefit derived from the unauthorized contracts (receipts) made in its name by Woodcock. It thereby ratified those receipts and cannot now be heard to deny their validity in the hands of the Bank.

The 13 new receipts being the valid obligations of the Elevator and the Elevator having defaulted thereon, the liabilities of the defendants Gill (as Custodian of the State Indemnity and Guaranty Fund), Woodcock and his surety, Insurance Company of North America, are the same as they would have been had Woodcock been expressly authorized by the Elevator to issue these receipts. We turn to the North Carolina Agricultural Warehouse Act to determine what those liabilities are.

Woodcock was not the employee or agent of the State, or of the State Warehouse System, since no part of his compensation was paid by either. G.S. 106-432.1 and G.S. 106-433(b). The Bank's right to proceed against the State Indemnity and Guaranty Fund does not, therefore, rest upon the principle of *respondeat superior*.

The State Indemnity and Guaranty Fund was created by G.S. 106-435 "in order to provide the financial backing which is essential to make the warehouse receipt universally acceptable as collateral." To that end G.S. 106-441 provides: "[T]he receipts issued under this section for cotton and other agricultural commodities shall be supported and guaranteed by the indemnity fund provided in § 106-435." Each receipt here in question states upon its face, "The State of North Carolina guarantees the integrity of this receipt." The extent of that guaranty is the right of recourse to the said fund. G.S.106-446.

In *Ellison v. Hunsinger*, 237 N.C. 619, 75 S.E. 2d 884, an action by the owner of the cotton wrongfully stored and delivered to another, upon the receipt issued therefor to the converter, this Court, speaking through Justice Parker, later Chief Justice, said:

"G.S. Ch. 106, Art. 38, makes * * * provision for the payment of full compensation to the plaintiff for his cotton by making (1) the bond of Noggle, local Manager of the Warehouse, Inc., and his employer, the Warehouse, Inc., primarily responsible for the plaintiff's loss, if there has been any default of Noggles and the Warehouse, Inc., in the faithful performance of their obligations in operating

a warehouse under the terms of G.S. 106, Art. 38; and if they are not responsible by making (2) the bond of Fairley, State Warehouse Superintendent, liable for plaintiff's loss, if there has been any default by him in the faithful performance of his duties as State Warehouse Superintendent; and (3) if the plaintiff's loss, or any part of it, is not covered by such bonds, and by the liability of the Warehouse, Inc., then the indemnifying or guaranty fund created by G.S. 106-435 and held in the State Treasury to the credit of the warehouse system is responsible to the plaintiff for his loss, or any part of his loss not covered by such bonds."

To the same effect, see: *Lacy v. Indemnity Co.*, 193 N.C. 179, 136 S.E. 359; *Lacy v. Indemnity Co.*, 189 N.C. 24, 126 S.E. 316.

In the present case, it has been judicially determined, as above noted, that Parham, the State Warehouse Superintendent, did not fail in the faithful performance of his duties and, consequently, neither he nor the surety on his bond is liable to the Bank.

[7] Woodcock argues in his brief, that, having "paid his debt to Society" on account of his failure to perform faithfully his duties as Local Manager of the Elevator, he cannot be held liable to the Bank. Not so! In the first place, the term "debt to Society" is a misnomer. One who serves a sentence imposed for a criminal offense pays no debt to Society. He suffers a punishment for his wrong doing. In the second place, he is now sued upon an obligation to the Bank, not to Society. He defrauded the Bank and violated his duty under the Warehouse Act by issuing warehouse receipts for which no grain had been delivered to the Elevator. G.S. 106-443. For the resulting loss, he and the surety on his bond are clearly liable to the Bank, theirs being the primary liability, that of the State Indemnity and Guaranty Fund secondary. *Credit Association v. Whedbee*, 251 N.C. 24, 110 S.E. 2d 795. Woodcock's actions were, in part, for his own benefit since the shortage of grain at the Elevator was due to his own wrongful deliveries of stored grain, but even if he were acting solely for the benefit of his principal, the Elevator, this would not absolve him from personal liability for his fraud upon the Bank. *Norburn v. Mackie, supra.*

Thus the Superior Court was in error in concluding and adjudging that the Bank is entitled to recover nothing of the

defendant Gill, as Custodian of the State Indemnity and Guaranty Fund, and nothing of the defendant Woodcock and his surety, Insurance Company of North America.

The remaining question relates to the amount the Bank is entitled to recover. Each of the 13 new receipts stated in words in its body that it was for "one hundred twelve thousand pounds of grain of the kind and grade described herein." In the margin, but as part of the printed, official form, were blanks for showing in figures both the number of pounds and the number of bushels. In each receipt these blanks were filled with figures showing the amount of grain as "112,000 pounds" and as "20,000 bushels." A bushel of corn weighs 56 pounds. Thus, there is an ambiguity in each receipt. Is it for 112,000 pounds, which is 2,000 bushels, or is it for 20,000 bushels, which is 1,120,000 pounds?

[8] Part 3 of the Uniform Commercial Code deals with commercial paper, not warehouse receipts. In G.S. 25-3-118(c) it provides, "Words control figures except that if the words are ambiguous figures control." Assuming, without deciding, that the same rule applies to warehouse receipts, it has no application here for the statement of poundage is the same in both words and figures, the variance is between pounds and bushels.

In its complaint the Bank alleged it is the holder for value of 13 receipts for 20,000 bushels of No. 2 yellow corn, each. Its prayer was for recovery of the value of that quantity of such corn. The answers of all defendants denied this allegation and the answers of all, save Woodcock, alleged, affirmatively, that the receipts were issued without authority and the Bank was not a transferee by due negotiation for the reason (among others) that this ambiguity appeared on the face of the receipts, Hartford further alleging that this ambiguity rendered the receipts void for uncertainty. Thereupon, the Bank filed a reply, with leave of the Court, alleging that the old receipts which it surrendered in exchange for those now in question called for 270,000 bushels, that it was the intent of all parties to the transaction that the 13 new receipts be for 20,000 bushels each, a total of 260,000 bushels, and the statement of poundage thereon was a mistake of drafting not detected at the time of the transaction. The reply prayed reformation of the receipts to show each represented 1,120,000 pounds, the weight of 20,000 bushels.

It is true, as the defendants contend in their brief, that we have said that a reply is a defensive pleading and the plain-

tiff's cause of action cannot be alleged therein but must be stated in the complaint. *Davis v. Highway Commission,* 271 N.C. 405, 156 S.E. 2d 685. The Bank, however, stated in its complaint the cause of action for recovery of the value of 260,000 bushels of corn alleged to be due it upon these receipts. Its prayer for reformation of the receipts for mistake in the drafting of them is a defensive measure raised in response to the defendants' several answers. The rule of pleading now cited by the defendants will not bar that relief if the Bank is otherwise entitled thereto.

[9]   The uncontradicted testimony of Mrs. Carlton, who prepared the receipts, is that Woodcock instructed her to make them out for 20,000 bushels each, that she undertook to do so and that, by her mistake, she stated the poundage therein incorrectly, stating the number of bushels correctly, took the receipts to the Bank and received in exchange receipts for a total of 270,000 bushels, which old receipts she canceled. Obviously, the Bank did not detect the mistake of the draftsman or it would not have released the old receipts calling for 270,000 bushels.

It is clear that, nothing else appearing, upon such showing of mutual mistake of fact resulting from an error of the draftsman, a court of equity will order the instruments reformed to express the true intent of the parties to the transaction. *Crews v. Crews, supra. Crawford v. Willoughby,* 192 N.C. 269, 134 S.E. 494; *King v. Hobbs,* 139 N.C. 170, 51 S.E. 911; Strong, N. C. Index 2d, Reformation of Instruments, § 1.

The Superior Court concluded:

"The plaintiff is not entitled to invoke the equity jurisdiction of this Court to reform warehouse receipts numbered 974 through 986 to change the pounds reflected thereon from 112,000 to 1,120,000, because the plaintiff does not have clean hands and, further, to grant such relief would be in direct conflict with the provisions of Chapter 25 of the General Statutes of North Carolina."

[10]   We find nothing in the Uniform Commercial Code, Chapter 25 of the General Statutes, which deprives a court of equity of its power to reform a warehouse receipt so as to correct a mistake of the draftsman. The maxim, "He who comes into equity must come with clean hands," is well established as a foundation principle upon which the equity powers of the Superior Courts rest. However, in its application, it is limited to

the conduct of the party seeking equitable relief in the specific matter before the court and does not extend to his general character. See: *S. H. Kress & Co. v. Aghnides*, 246 F. 2d 718 (4th Cir.) ; *Minnesota Muskies, Inc. v. Hudson*, 294 F. Supp. 979 (D.C.N.C.) ; 27 AM. JUR. 2d, Equity, § 142; 30 C.J.S., Equity, § 98c. Nothing in the findings of fact, or in the evidence, indicates any knowledge, or even suspicion, by the Bank, at the time it took these warehouse receipts in exchange for the old receipts, that these receipts were not valid or that each did not, in fact, represent 20,000 bushels of No. 2 yellow corn then in the Elevator. Obviously, the Bank had nothing whatever to gain by releasing receipts, valid in its hands, for 270,000 bushels of corn, held as security for the note of a maker in precarious financial condition, in return for spurious receipts purporting to represent a total of only 26,000 bushels.

[12]   The Superior Court's conclusion that the Bank does not have clean hands in this matter appears to rest upon its findings of fact to the effect that, for a substantial period prior to this transaction, the Bank knew of Southeastern's precarious financial condition; that over such period the Bank had been exceedingly generous in allowing overdrafts by Southeastern and making loans to it; and that, at the time of this transaction, the Bank knew an official examination of the Elevator was in progress and that the Bank was rather lax and slipshod in its inspection and handling of the documents in this particular exchange. The difficulty we have with the Superior Court's conclusion is not with these findings of fact but stems from their inadequacy to show bad faith on the part of the Bank in taking these receipts in lieu of the valid ones previously held by it. In no way could the Elevator's liability have been increased or the Bank's rights have been enlarged by the exchange.

Had the draftsman's error in stating the poundage on the receipts been detected by Mrs. Carlton, the draftsman, and Mrs. Walker, the Bank's note teller, at the time Mrs. Carlton tendered the new receipts as an exchange for the old, it is inconceivable that Mrs. Carlton would have failed to correct her error.

[11]   "Clean hands" connotes absence of sharp practice and bad faith on the part of the party seeking equity, not complete freedom from negligence and gullibility. As Justice Hoke, later Chief Justice, observed in *Tobacco Association v. Bland*, 187 N.C. 356, 360, 121 S.E. 636:

"Considering the record, then, in view of the general principles which should prevail in such cases, it is recognized that one who invokes in this way the equitable powers of the court for the protection of his rights must not, by his own breach of duty, *have caused the injuries or threat of them, of which he complains,* a position to some extent embodied in the more familiar maxim 'that he who comes into equity must do so with clean hands.' " (Emphasis added.)

See also: *Beam v. Wright,* 224 N.C. 677, 684, 32 S.E. 2d 213; *Stelling v. Trust Co.,* 213 N.C. 324, 197 S.E. 754; 27 AM. JUR. 2d, Equity, § 137; 30 C.J.S., Equity, §§ 93, 95, 98.

[12]  We find nothing in the findings of fact by the Superior Court, or in the evidence set forth in the record, to support the conclusion that, in the transaction in which the Bank acquired the new warehouse receipts in exchange for the old, the Bank was acting in bad faith, or engaged in any sharp practice, so as to render its hands unclean and bar it from asking a court of equity to reform the new receipts to make them express the clear intent of the parties. The Bank, on this record, is entitled to have the 13 new receipts it now holds reformed so as to show they represent 1,120,000 pounds of corn each.

The judgment of the Superior Court that the Bank have and recover nothing of the defendant Gill, as Custodian of the State Indemnity and Guaranty Fund, or of the defendants Woodcock and Insurance Company of North America is reversed and this matter is remanded to the Superior Court of Duplin County for the entry of a judgment in conformity with this opinion.

As to Defendants Parham and Hartford Accident and Indemnity Company

Affirmed.

As to Defendants Gill, Woodcock and Insurance Company of North America

Reversed and remanded.

Justices COPELAND and EXUM took no part in the consideration or decision of this case.