THE BRANCH BANKING & TRUST COMPANY, PLAINTIFF v. EDWIN GILL, TREASURER OF THE STATE OF NORTH CAROLINA; W. G. PARHAM, JR., STATE WAREHOUSE SUPERINTENDENT; L. C. WOODCOCK: INSURANCE COMPANY OF NORTH AMERICA: AND HARTFORD ACCIDENT AND INDEMNITY COMPANY, DEFENDANTS, AND HENRY L. STEVENS III AND VANCE B. GAVIN, RECEIVERS OF SOUTHEASTERN FARMERS GRAIN ASSOCIATION, INC., AND GREAT AMERICAN INSURANCE COMPANY, THIRD PARTY DEFENDANTS.

No. 84

(Filed 23 August 1977)

1. **Uniform Commercial Code § 58— warehouse receipts—absence of transferor's indorsement—no due negotiation**

    Where a bank, by delivery from the payee, acquired without indorsement 13 fraudulent warehouse receipts which payee had obtained for nonexistent grain, the bank did not take by "due negotiation" even though payee's bookkeeper subsequently stamped the payee's name on the reverse side of the receipts, the bookkeeper having neither the authority nor the intent thereby to indorse them in the name of the payee. By this transaction the bank became a mere transferee of the receipts, acquiring only the title and rights which transferor had under the receipts. Because transferor had no title to any grain by virtue of the 13 receipts, the bank had no claim against the warehouse under G.S. 25-7-502 and G.S. 25-7-504, its claim—if any—being under G.S. 25-7-203.

2. **Uniform Commercial Code § 58— warehouse receipts—priority of competing claims—purpose of statutes**

    The primary purpose of G.S. 25-7-502 and 25-7-504 is to determine the priority of competing claims to valid documents and goods *actually* stored in a warehouse and to determine the issuer's liability for a misdelivery of goods *actually received* by it.

3. **Uniform Commercial Code § 58— warehouse receipts—due negotiation—title to underlying goods**

    Generally, a holder of negotiable warehouse receipts acquired through "due negotiation" will receive paramount title not only to the documents but also to the goods represented by them, the purpose of U.C.C. Art. 7, Part 5, being to facilitate the negotiability and integrity of negotiable receipts.

4. **Uniform Commercial Code § 58— warehouse receipts—misdescribed or nonexistent goods—liability of warehouse**

    The purpose of G.S. 25-7-203 is to protect specified parties to or purchasers of warehouse receipts by imposing liability upon the warehouseman when either he or his agent fraudulently or mistakenly issues receipts (negotiable or nonnegotiable) for misdescribed or nonexistent goods.

5. **Uniform Commercial Code § 58— warehouse receipts—misdescribed or nonexistent goods—action against warehouseman—burden of proof**

    To be entitled to recover from a warehouseman under G.S. 25-7-203 a claimant has the burden of proving that he (1) is a party to or a purchaser of a document of title other than a bill of lading; (2) gave value for the document; (3) took the document in good faith; (4) relied to his detriment upon the description of the goods in the document; and (5) took without notice that the goods were misdescribed or were never received by the issuer.

Trust Co. v. Gill, State Treasurer

6. **Uniform Commercial Code §§ 4, 58— exchange of warehouse receipts—acquisition by purchase and for value**

When a bank surrendered to a grain association its old notes and the 16 negotiable warehouse receipts securing them in return for new notes secured by 13 new negotiable warehouse receipts, the bank acquired the 13 new receipts by purchase and gave "value" for them. G.S. 25-1-201(32), (33), and (44).

7. **Uniform Commercial Code § 58— fraudulent warehouse receipts—acquisition in good faith and without notice—absence of verification of grain shortage**

The absence of evidence that a bank's agents had themselves verified a warehouse's shortage of grain or had eyewitness knowledge that 13 warehouse receipts were fraudulently issued without the deposit of grain in the warehouse does not necessarily mean that they did not *in fact* know and does not preclude a finding that the bank did not acquire the 13 receipts in good faith and without notice of claims and defenses.

8. **Uniform Commercial Code § 58— exchange of warehouse receipts—acquisition of fraudulent receipts not in good faith and without notice**

In a transaction in which a bank exchanged demand notes of a grain association and 16 warehouse receipts securing them for new demand notes and 13 new warehouse receipts which had been fraudulently issued by the warehouse manager, who was also an officer of the grain association, for the purpose of obtaining and canceling the old receipts and concealing a grain shortage in the warehouse, the bank did not acquire the 13 new warehouse receipts in good faith and without notice that they had been fraudulently issued, and the bank thus could not recover on the 13 fraudulent warehouse receipts, where (1) the bank was fully alerted to the warehouse manager's dual agency for the grain association and the grain warehouse and warned of the opportunity for fraud inherent in that situation; (2) the bank was aware of the grain association's precarious financial condition but continuously dealt with the association in a manner inconsistent with sound banking practice as well as its own policies purporting to govern the association's line of credit; and (3) the warehouse manager's requests on a prior occasion and the occasion in question, when warehouse examiners arrived for routine inspections, that the bank refinance existing demand notes of the association without increasing the indebtedness and exchange the warehouse receipts securing the old notes for new receipts was so highly irregular as to provide notice that the warehouse was short of grain. G.S. 25-7-203.

9. **Uniform Commercial Code § 58— negotiable document of title—intentional ignorance of facts**

The Uniform Commercial Code (G.S. 25-7-203 and G.S. 25-1-201(25)) does not permit parties intentionally to keep themselves in ignorance of facts which, if known, would defeat their rights in a negotiable document of title.

10. **Warehousemen § 3— purpose of State Indemnifying and Guaranty Fund**

When the General Assembly, by G.S. 106-435, created the State Indemnifying and Guaranty Fund to safeguard the State Warehouse System and to make its receipts acceptable as collateral, it did not intend to encourage individuals or financial institutions to engage in transactions from which they would otherwise have recoiled; rather, the fund was created to protect those parties to or pur-

chasers of warehouse receipts who, acting in good faith and without reason to know that the goods described thereon are misdescribed or nonexistent, suffer loss through their acceptance or purchase of the receipts.

This opinion displaces the opinion in *Trust Co. v. Gill, State Treasurer*, 286 N.C. 342.

Justice LAKE dissenting.

Justice COPELAND did not participate in the hearing or decision of this case.

ON petition of defendants, Edwin Gill, Treasurer of the State of North Carolina and Custodian of the State Indemnity & Guaranty Fund, and Insurance Company of North America, to reconsider our former decision, reported in 286 N.C. 342, 211 S. E. 2d 327 (1975). The appeal was redocketed and reheard as Case No. 131 at the Spring Term 1975.

Plaintiff, The Branch Banking & Trust Company, hereinafter called Bank, brought this action to recover of the defendants the sum of $383,900.00, the value of yellow corn allegedly represented by 13 negotiable warehouse receipts. These receipts had been pledged to Bank by Southeastern Farmers Grain Association, Inc., hereinafter called Southeastern, as collateral for loans aggregating $314,354.38. In the alternative, Bank seeks to recover the principal of this indebtedness with interest.

The 13 receipts in suit, dated 5 May 1970 and numbered 974-986, were issued by Farmers Grain Elevator at Warsaw (Elevator), a unit of the State Warehouse System. Defendant Parham is the State Warehouse Superintendent. Defendant Gill is sued as custodian of the State Indemnity and Guaranty Fund, which is maintained pursuant to N.C. Gen. Stats., ch. 106, art. 38 (G.S. 106-435). Defendant L. C. Woodcock is sued as the local manager of Elevator, which position he held from 1 May 1967 to 8 May 1970. Defendant Insurance Company of North America is surety on the bond executed by Woodcock in the amount of $100,000.00 to insure the faithful performance of his duties as manager of Elevator. Defendant Hartford Accident and Indemnity Company is the surety upon a blanket faithful performance bond insuring the State in the amount of $100,000.00 against financial loss from any employee's failure to account for all money and property received by virtue of his employment. Woodcock, in addition to being the manager of Elevator, was also Secretary-Treasurer of Southeastern, the operations of which he conducted. Southeastern, now defunct, is in receivership.

Defendants Gill and Parham, answering the complaint, alleged that Woodcock, as manager of Elevator, unlawfully and fraudulent-

ly issued the 13 receipts to Southeastern without receiving any grain therefor, and delivered them to himself as manager of Southeastern for the purpose of using them as collateral for Southeastern's notes held by Bank. Defendants denied liability to Bank on the grounds that (1) the receipts were not duly negotiated to Bank by Southeastern; (2) Bank did not purchase the receipts in good faith and without notice of the defenses to them; and (3) the receipts were irregular on their face in that each purported to acknowledge receipt of 112,000 pounds of corn (equivalent to 2,000 bushels) while specifying the amount of grain at 20,000 bushels. The answers of the other defendants in substance alleged the same defenses.

In a cross action the original defendants made Woodcock, the receiver of Southeastern, and Great American Insurance Company, the surety on the fidelity bond which Woodcock executed to Southeastern for his faithful performance as manager, third-party defendants to this action. They alleged that, if Bank should recover against the original defendants, Woodcock and Southeastern were primarily liable to Bank and the court should so adjudicate.

Bank, replying "to the answers of the various defendants," alleged (1) that it was entitled to have the 13 warehouse receipts reformed to show that they represent 1,120,000 pounds of grain each; (2) that the receivers of Southeastern should be required to endorse the receipts properly and the endorsement held to relate back to the date the receipts were delivered to Bank; and (3) that "defendants be adjudged to be estopped to plead" Woodcock's fraud and to deny the validity of the warehouse receipts.

A jury trial was waived and, at the 18 March 1974 Civil Session of Duplin, Judge Cowper heard extensive oral testimony and received in evidence voluminous documentary exhibits.

Upon a finding that Southeastern sustained no loss through any fraudulent acts of Woodcock, its secretary-treasurer and manager during the period 1 May 1967 until 8 May 1970, on 14 April 1974 Judge Cowper dismissed with prejudice the original defendants' claim against Great American Insurance Company. Upon findings that original defendant Parham was guilty of no fraud or negligence in the operation of Elevator, on 6 May 1970 Judge Cowper dismissed with prejudice the action against Parham. No appeal was taken from these two judgments.

On 13 May 1974 Judge Cowper filed his judgment. His findings pertinent to this appeal are summarized or quoted below (enumeration being that of the judgment).

(1) Southeastern engaged in the business of buying and selling grain. During the time pertinent to this litigation it owned a grain storage facility (elevator) at Warsaw, North Carolina.

(2) From (August) 1966 through 8 May 1970 Parham, as State Warehouse Superintendent leased Southeastern's storage facility at Warsaw and, under the provisions of the United States Warehouse Act and the North Carolina Warehouse Law, operated it under the name of Farmers Grain Elevator (Elevator) as a public warehouse for the storage of grain.

. . .

(4) From April 1967 until 5 May 1970 Woodcock was an employee and Secretary-Treasurer of Southeastern. He was also licensed by Parham to act as local manager of Elevator. He received his compensation as manager of Elevator from Southeastern.

(5) Elevator neither bought nor sold grain. Its operations were limited to the storage of grain. Unlike Southeastern, it had no financial transactions. To obtain the necessary finances with which to operate, Southeastern arranged with Bank to borrow money from its Warsaw branch.

(6) From September 1967 and continuing throughout the period here involved, E. Craven Brewer was the Bank's manager at Warsaw.

(7) All grain stored with Elevator was weighed, inspected and typed. Thereafter an in ticket, a nonnegotiable document, was issued for the grain stored. Upon this ticket, on request, a depositor was entitled to the issuance of a negotiable warehouse receipt for the grain he stored.

(8) State and federal law required that warehouse receipts be issued only for grain actually in storage in Elevator "and that they be issued in terms of pounds of grain." Preprinted and prenumbered blank warehouse receipt forms, bearing the signature of Parham, were furnished to Woodcock for issuance by him as local manager of Elevator. In addition to acknowledging the receipt of a specified number of pounds of grain of the described grade and kind, the receipt form provided: *"The State of North Carolina guarantees the integrity of this receipt.* Grade and weight are as determined by an inspector and weigher licensed under the United States Warehouse Act. Said grain is fully insured by the State Warehouse Superintendent against loss or damage by fire, lightning, inherent

explosion, tornado, cyclone and windstorm unless expressly stated otherwise hereon." (Emphasis added.)

(9) The signature of Woodcock was required on each receipt prior to its issuance. The receipt also stated upon its face in red ink: "The Local Manager [Woodcock] is an employee of Southeastern Farmers Grain Association, Inc."

(10) Bank and Southeastern had agreed that warehouse receipts would be pledged as security for most loans obtained by Southeastern and that Bank would lend to Southeastern 80% of the lower of the cost or market price of the grain represented by the receipt.

(11) Before Elevator began its operations Parham and a representative of the Department of Agriculture met with officers of Southeastern and Bank "to discuss the nature and limitations of warehouse receipt financing." In consequence "each of the receipts initially received by the Bank as collateral on loans of Southeastern had a notation on the outer perimeter of the receipt indicating the inspection weight certificate number or some other identifying information to relate the warehouse receipts to the in ticket. This notation indicated that grain had actually been received by the Elevator. This practice continued until E. Craven Brewer became manager of the Warsaw Branch of the plaintiff Bank, and the receipts began to be issued in large round numbers, such as 5,000, 10,000, or 20,000 bushels."

(12) Beginning in 1969 Bank habitually carried substantial overdrafts on Southeastern's checking account. Throughout 1969 and January 1970 Bank held items for large sums from several days to several weeks without charging them to Southeastern's account or returning them to the payee. These overdrafts reached a high of $212,000.00 on 17 November 1969. Under North Carolina law and Federal regulations, if an overdraft item is not returned by the close of the business day following the receipt of the item, a bank loses its right to charge it back against the payee or an endorser.

(13) Under the "line of credit" which Bank's home office approved for Southeastern during 1969, Southeastern was required, inter alia, to provide Bank with weekly inventory reports, to furnish financial information as requested, and to repay in full all loans by 15 April 1969. Notwithstanding, on 31 May 1969 the balance due on notes which specifically recited they were secured by a chattel mortgage on grain stored in the Blanchard-Farrior Warehouse at Wallace, N. C. were renewed "despite the fact that the insurance

report received by the Bank for the month of April disclosed that there was no grain in the Blanchard-Farrior Warehouse."

(14) Bank did not receive Southeastern's financial statement for the fiscal year ending 31 May 1969 until the first week in November and the home office (in Wilson) did not approve a new line of credit for Southeastern until 20 November 1969. "Nevertheless, beginning in June of 1969 the Warsaw Branch of the plaintiff Bank began making substantial loans to Southeastern. By November 17, 1969, the Bank held loans of Southeastern in the amount of $383,253.00 plus overdrafts on the Southeastern checking account in the amount of $212,000.00. The request for a line of credit of $500,000.00 was submitted by Mr. Brewer to the home office of the plaintiff Bank on November 11, 1969, and on November 12, 1969, Mr. Brewer made an unauthorized loan to Southeastern in the amount of $131,520.00. The 1969 line of credit was increased on December 17 to $600,000.00 which was promptly exceeded by the Warsaw Branch on December 22, 1969, when the loan balance of Southeastern reached a total of $620,653.00, not counting outstanding overdrafts. The loan balance continued to climb to a sum of $634,224.00, which remained without reduction until February 3, 1970.

"(15) In addition, the Bank on December 11 and December 15, 1969, paid bills of lading of Southeastern with the Bank's own funds in the respective amounts of $22,548.67 and $34,465.86 without receiving payment or collateral until January 6, 1970, and January 7, 1970, respectively."

(16) On 9 February 1970 U. S. Warehouse Examiner Flynt arrived at Elevator to make a periodic examination pursuant to the agreement between the State of North Carolina and the U. S. Department of Agriculture. Woodcock, knowing that the grain in storage was not equal to Elevator's storage obligations, instructed Southeastern's bookkeeper (Mrs. Carlton) to prepare a check for $165,760.00 and deliver it to Bank in exchange for nine warehouse receipts (Nos. 834, 838-840, 845-847, 949 and 950), which were pledged to the Bank as security. Mrs. Carlton prepared the check, dated 10 February 1970, and delivered it to Bank in exchange for the designated warehouse receipts. "At the time of the presentation of this check for $165,760.00, the balance in Southeastern's checking account was $112,777.50. Pursuant to instructions from Bank's note teller (Mrs. Walker), a 'Hold' was put on Southeastern's bank balance on February 10, 1970."

(17) The nine warehouse receipts obtained by Southeastern's bookkeeper totaled 140,000 bushels of grain. Upon cancellation of

these receipts Elevator's grain shortage was eliminated and the inspector failed to discover anything "other than operational shortages."

(18) On 12 February 1970, the day after Inspector Flynt completed his examination, acting under Woodcock's instructions, Southeastern's bookkeeper prepared and delivered to Bank (1) Southeastern's check for $1,036.00 as payment of interest on the notes secured by the nine warehouse receipts she had obtained from Bank on 10 February 1970, (2) a new note in the amount of $71,040.00, and (3) six new warehouse receipts for 10,000 bushels each as security for said note. "The records indicate that no new grain had been received to support the issuance of the six new warehouse receipts. This new note provided the necessary funds to make good the check previously presented to the Bank on February 10, 1970 in the amount of $165,760.00."

Between 10 February 1970 and 5 May 1970, Bank continued to approve bills of lading for Southeastern to purchase 230,013.98 bushels of new grain shipped in from the West. "This was the period in the past during which the plaintiff had insisted upon and had received full payment of outstanding loans. Nevertheless during 1970 the plaintiff [Bank] continued to hold substantial loans secured by warehouse receipts and made no insistence that Southeastern sell the grain it allegedly had on hand before selling current purchases of Western grain. By letter dated March 11, 1970, E. C. Brewer advised the home office of the plaintiff Bank that the balance of loans to Southeastern secured by warehouse receipts was $468,464.00, and that these loans were expected to be substantially reduced as Southeastern's grain inventory was lowered from March 11, 1970 to May, 1970. In fact, the outstanding loan balance as of May 5, 1970 was $421,104.00."

(19) Between 10 February 1970 and 5 May 1970 Woodcock caused Elevator to deliver to or for the account of Southeastern 444,303.73 more bushels of grain than Elevator received during that period. These deliveries exceeded the grain allegedly stored by Southeastern in Elevator on 10 February 1970 by 112,928.56 bushels.

(20) On 5 May 1970, Warehouse Examiner Brown arrived at the Elevator to make another routine check of the grain storage operation. Woodcock then knew that due to the shipments so made to Southeastern's account there was not sufficient grain in the Elevator to meet the outstanding warehouse receipts.

(21) At the opening of business on 5 May 1970 the Warsaw branch of Bank held five demand notes of Southeastern totaling $545,424.00, 18 warehouse receipts for yellow corn, and one for barley. (Six of these receipts, Nos. 962-967, pledged to secure a note for $41,440.00, were receipts referred to in Finding No. 18 above.)

(22) During the morning of 5 May 1970, Woodcock caused Southeastern's check, drawn on sufficient funds, to be delivered to Bank in exchange for two of the pledged receipts (Nos. 951 and 953, dated 5 January 1970), which were immediately canceled on the books of Elevator. Thus, on the afternoon of 5 May 1970, Bank held 17 warehouse receipts (Nos. 954-958, 960-967, 969-971, and 973). The grain for these receipts had been delivered by Farmers Grain Elevator to or on the account of Southeastern, which had not surrendered the warehouse receipts for cancellation.

(23) On the afternoon of 5 May 1970 Woodcock went to Bank and requested C. C. Rouse, assistant branch manager, acting in the absence of E. C. Brewer, who was away on military duty, to release to him a portion of the warehouse receipts which Bank was holding as collateral. "The Bank was informed that the warehouse examiner was at the facility and the warehouse receipts were needed for the examination."

(24) After consulting with the home office, Rouse refused to release the receipts unless the loans which they secured were paid. As was done during the examination on February 10, 1970, Woodcock offered Bank a check drawn on insufficient funds, but Rouse refused it. Thereupon, Woodcock and Rouse agreed to negotiate a new loan, secured by new receipts, which would provide funds necessary to pay off the old loans secured by the old receipts.

(25) On the morning of 6 May 1970, pursuant to the instructions of Woodcock, the bookkeeper of Southeastern prepared two notes made by Southeastern payable to the order of the Bank in the total amount of $307,840.00, a deposit slip for that amount, and 13 new warehouse receipts numbered 974-986 issued by Elevator to Southeastern. She then also prepared Southeastern's check payable to the Bank in the amount of $328,952.00.

(26), (28) About noon on 6 May 1970, pursuant to the instructions of Woodcock, Southeastern's bookkeeper delivered the above papers to the Bank's note teller, who then surrendered 16 of the 17 warehouse receipts enumerated in paragraph 22 above. However, the teller retained the old notes because Southeastern's bookkeeper had failed to deliver a check for the accrued interest on them.

(27) At the close of business on 5 May 1970 Southeastern's checking account balance was $63,663.30. During 6 May 1970 five deposits totaling $55,201.54 and one check posted in the amount of $83,625.92 left a balance at the close of the day of $35,238.92.

(29) Shortly after the bookkeeper left with the 16 receipts on 6 May 1970 Bank's note teller discovered that the new receipts numbered 974-986 had not been endorsed; whereupon she telephoned Southeastern's bookkeeper and requested that they be endorsed.

(30) A resolution adopted by the Board of Directors of Southeastern, a copy of which had been delivered to the Bank, required the signatures of both its president and secretary-treasurer on all the notes and other evidences of such loans, all instruments of pledge, assignment or lien, and it provided that none of these instruments would be valid unless so signed or indorsed.

(31) Prior to 6 May 1970, on every occasion during 1969 and 1970, the indorsement of all warehouse receipts which Southeastern delivered to the Bank had contained Woodcock's signature.

(32) On the morning of 7 May 1970, Southeastern's bookkeeper went to the Bank and, with a rubber stamp, placed Southeastern's name on the back of each warehouse receipt numbered 974-986. These receipts have never been indorsed by Woodcock or any other officer of Southeastern. Neither Bank's note teller, Southeastern's bookkeeper, nor Woodcock considered the stamp which the bookkeeper had placed on the receipts a sufficient indorsement.

(33) Late in the afternoon of 7 May 1970, Southeastern's bookkeeper delivered to Bank a check drawn on Southeastern's checking account in the amount of $3,393.20 to pay the interest on the old notes.

(34) "Because of the lack of endorsement on the warehouse receipts, Mrs. Corrine Walker [note teller] did not process any of the papers that had been delivered to her even after receipt of the interest check, but instead held them in anticipation of obtaining the endorsement."

(35) In addition to the lack of endorsement each of the new receipts which Southeastern had pledged to the Bank contained an irregularity on the face thereof in that each receipt stated in words that it represented 112,000 pounds of corn, whereas the number of

bushels, shown in numerals, was 20,000. One hundred, twelve thousand pounds of corn are only 2,000 bushels.

(36), (37) During the afternoon of 7 May 1970, Inspector Brown discovered that Elevator was substantially short of grain and advised Parham of his findings. Parham and A. R. Willis of the U. S. Department of Agriculture immediately went to Warsaw to confer with the examiner and, during their continued investigation, they discovered the issuance of the 13 new receipts (Nos. 974-986). That evening Parham advised Rouse of the shortage and that Bank should have no further transactions with Southeastern until further determinations were made.

(38), (39) On the morning of 8 May 1970 Parham and Willis conferred with Rouse and A. F. Harrell (Bank's senior vice-president, who came from Wilson), and discussed with them the examiner's findings and the 13 warehouse receipts. Harrell instructed the Warsaw branch to hold the processing of the loan papers which Southeastern had delivered to Bank on 6 May 1970 until legal advice could be obtained "as to how to handle the transaction."

(40) On 11 May 1970, with full knowledge of Elevator's shortage and the improper issuance of the 13 warehouse receipts, Bank proceeded to process the papers which the note teller had held in abeyance from the transaction on May 6, 1970. Bank credited the proceeds of its new loan to Southeastern to the checking account of Southeastern and charged against that account the checks Bank had received from Southeastern's bookkeeper covering the principal and interest on the old notes. Immediately thereafter Bank credited the balance then in the account against Southeastern's remaining indebtedness to the Bank, and closed the account.

(41) The plan which enabled Southeastern to deliver to Bank the 13 new, fraudulent warehouse receipts in exchange for the 16 old warehouse receipts was not intended to and did not in fact benefit Elevator. All the grain which Southeastern had stored in Elevator having been delivered to it, or upon its order, Southeastern was obligated to surrender the 16 receipts to Elevator for cancellation, and when Elevator obtained possession of them "it had a perfect right to cancel them on its records."

(42), (43) On 14 May 1970, Bank demanded that Parham deliver to it the #2 yellow corn represented by the 13 new receipts it then held. On that date the market value of such corn was $1.44 per bushel.

(44) On 18 August 1970 Bank made demand upon Parham for the payment of all amounts which Southeastern owed it. A like demand was made on defendant Gill as custodian of the State Indemnity & Guaranty Fund.

(45) Southeastern was insolvent on 8 May 1970, and its affairs have been placed in the hands of receivers by order of the Superior Court of Duplin County.

(46) The Insurance Company of North America, a surety for Woodcock, manager of Elevator, executed a bond in the amount of $100,000.00 conditioned upon his faithful performance of his duties as such manager.

In addition to the foregoing findings of fact, all of which except No. 41, the Court held, in its former opinion, to be supported by the evidence, Judge Cowper made the following findings and conclusions summarized below (enumeration ours):

1. Bank did not acquire the 13 receipts numbered 974-986 by due negotiation under G. S. 25-7-501. Therefore, under G. S. 25-7-504, Bank holds the receipts subject to all claims and defenses which Elevator has against Southeastern. The grounds upon which this holding is based are: (a) The stamp which Southeastern's bookkeeper placed on the back of the receipts was not a valid indorsement. (b) Each of the receipts was irregular on its face in that the pounds of grain specified therein were not commensurate with the bushels specified, and this irregularity was sufficient to put Bank "on inquiry as to the 'regular course' quality of the transaction." (c) Also sufficient to put Bank on such inquiry was its knowledge of Southeastern's poor financial condition and the circumstances surrounding the transaction of 6 May 1970. (d) During 1969 and the first five months of 1970, Bank handled Southeastern's banking business "with gross disregard of the ordinary good business and banking practices." On 6 May 1970 Bank voluntarily surrendered 16 warehouse receipts pledged as collateral on notes without canceling or surrendering the notes. Due to the irregularities in the transaction Bank voluntarily delayed posting the new notes secured by the 13 fraudulently issued warehouse receipts. Then, after receiving actual notice of the infirmities and defenses to the 13 receipts, Bank elected to confirm the May 6th transactions and accept the instruments. (e) "Under the circumstances of this case, the plaintiff Bank did not receive warehouse receipts numbered 974 through 986 in good faith without notice of claims and defenses."

2. In causing Elevator (a) to deliver grain to or for Southeastern between 10 February 1970 and 5 May 1970 without surrendering Southeastern's outstanding warehouse receipts; (b) to issue the 13 receipts (Nos. 974-986) to Southeastern without the deposit of any grain; and (c) to cancel "certain warehouse receipts" which Southeastern had the obligation to surrender to Elevator, Woodcock was acting for the benefit of Southeastern. Defendants Gill and Parham are not estopped to plead the fraudulent conduct of Woodcock as a complete defense to Bank's cause of action. Gill, Parham, Insurance Company of North America and Hartford Accident and Indemnity Company, representing Elevator, have a complete defense against Southeastern and against Bank as to the 13 warehouse receipts now held by the Bank since they represented no grain in storage and were fraudulently issued.

3. "[B]ecause the plaintiff [Bank] does not have clean hands, and, further, to grant such relief would be in direct conflict with the provision of Chapter 25 of the General Statutes of North Carolina," Bank is not entitled (a) to require Southeastern's indorsement of the 13 receipts; (b) to reform the receipts by changing the number of pounds shown thereon; or (c) to require Elevator to restore to it the 16 receipts it surrendered to Southeastern on 6 May 1970. Bank abandoned any rights to recission and restitution by honoring Southeastern's check for $35,238.92 on 11 May 1970, when all the facts had been fully disclosed.

4. Since neither Woodcock as local manager of Elevator, nor Parham as State Warehouse Superintendent, is liable to Bank in any amount, Insurance Company of North America and Hartford Accident and Indemnity Company have no liability to Bank.

Upon the foregoing findings of fact and conclusions of law Judge Cowper entered judgment that Bank recover nothing of defendants.

The Supreme Court heard Bank's appeal prior to its determination by the Court of Appeals and, two justices not sitting, affirmed the trial court's judgment that Bank recover nothing of Parham and Hartford Accident and Indemnity Company. The judgment that Bank recover nothing from either Gill as custodian of the State Indemnity Fund or defendants Woodcock and his surety, Insurance Company of North America, was reversed. The cause was remanded for entry of judgment (a) reforming the 13 warehouse receipts to show that each represented 1,120,000 pounds of corn and (b) decreeing that Bank recover of these three defendants the value of the

corn represented by those receipts as reformed, not to exceed the amounts of the debt for the payment of which they were pledged, the State Indemnity and Guaranty Fund being secondary. These three defendants, in compliance with our Rule 44 (254 N. C. 785) petitioned for a rehearing, which was allowed.

On 8 January 1977 the Honorable Edwin Gill was succeeded as Treasurer of the State of North Carolina by the Honorable Harlan E. Boyles, who was automatically substituted as a party to this action by App. R. 38 (c).

Upon the rehearing six justices were sitting.

*Carr, Gibbons and Cozart; Johnson and Johnson; and Dees, Dees, Smith, Powell & Jarrett for plaintiff-appellant.*

*Rufus L. Edmisten, Attorney General, Millard R. Rich, Jr., Assistant Attorney General, and Manning, Fulton and Skinner for Gill, defendant-appellee.*

*Young, Moore and Henderson for Insurance Company of North America, defendant-appellee.*

*Henry L. Stevens III and Vance B. Gavin, Receivers of Southeastern Farmers Grain Association, Inc., third-party defendant-appellees.*

SHARP, Chief Justice.

In our earlier opinion in this case we held: (1) that the Bank did not take the 13 fraudulent warehouse receipts (Nos. 974-986) by "due negotiation" and thus did not acquire the rights specified in G.S. 25-7-502; (2) that "nothing else appearing" the Bank was merely a transferee of the negotiable warehouse receipts and thus acquired no greater rights or title than its transferor, Southeastern; (3) that Elevator, by canceling the 16 old receipts, obtained from the Bank by Woodcock's fraud, ratified Woodcock's issuance and exchange of the 13 fraudulent receipts for the 16 receipts previously held by the Bank, and it cannot now deny their validity; (4) that there was insufficient evidence to support a finding or conclusion that "the Bank was acting in bad faith" when it exchanged the 16 old receipts for the 13 new ones; that the Bank is entitled to have the new receipts reformed to show they represent 1,120,000 pounds of corn each; and (5) that Woodcock and the surety on his bond are primarily liable to the Bank for his fraud upon it. 286 N.C. at 357, 360, 365, 211 S.E. 2d at 338, 339, 343. Upon this rehearing we have elected to reconsider

these holdings and to redetermine the questions raised by the appeal.

[1]    Our prior holding that the Bank did not take the 13 receipts through "due negotiation" is clearly correct. In pertinent part G.S. 25-7-501 provides:

"(1) A negotiable document of title running to the order of a named person is negotiated by his indorsement and delivery. . . .

"(4) A negotiable document of title is 'duly negotiated' when it is negotiated in the manner stated in this section to a holder who purchases it in good faith without notice of any defense against or claim to it on the part of any person and for value, unless it is established that the negotiation is not in the regular course of business or financing or involves receiving the document in settlement or payment of a money obligation."

*Holder*, as defined by G.S. 25-1-201(20) "means a person who is in possession of a document of title . . . drawn, issued or indorsed to him or to his order or to bearer or in blank."

By their terms, the grain the 13 warehouse receipts purportedly represented was to be delivered to Southeastern or to its order. These receipts, therefore, were negotiable documents of title. G.S. 25-1-201(15), G.S. 25-7-102(1)(e), G.S. 25-7-104(1)(a). These receipts, however, were not indorsed by Southeastern at the time they were delivered to the Bank. Neither Woodcock, the secretary-treasurer, nor any other officer of Southeastern ever signed the receipts. Upon Bank's request for its indorsement, Southeastern's bookkeeper, Mrs. Carlton, stamped the name "Southeastern Farmers Grain Association, Inc." on the reverse side of the receipts.

As we said in our former opinion, "[T]he affixing of the payee's (or subsequent holder's) name upon the reverse side of a negotiable document of title by rubber stamp is a valid indorsement, if done by a person authorized to indorse for the payee and with intent thereby to indorse. *Mayers v. McRimmon*, 140 N.C. 640, 53 S.E. 447. However, the Superior Court found that Mrs. Carlton, who stamped the name of Southeastern upon the reverse side of these receipts, had neither the authority nor the intent thereby to indorse them in the name of Southeastern. The evidence supports these findings and would support no contrary finding." *Trust Co. v. Gill, State Treasurer*, 286 N.C. 342, 358, 211 S.E. 2d 327, 338 (1975). Since the receipts were not properly indorsed to the Bank, they were not negotiated to it. The Bank, therefore, not having acquired the

receipts through "due negotiation," did not acquire the rights provided in G.S. 25-7-502.

Under G.S. 25-7-506 the Bank could compel Southeastern to supply the lacking indorsement to the 13 receipts. However, the transfer "becomes a negotiation only as of the time the indorsement is supplied." Since the Bank was specifically informed of the fraud surrounding the issuance of the receipts on the evening of 7 May 1970 any subsequent indorsement by Southeastern would be ineffective to make the Bank "a holder to whom a negotiable document of title [was] duly negotiated." G.S. 25-7-501(4).

Thus, because of the lack of proper negotiation, the Bank became a mere transferee of the 13 warehouse receipts. The status of such a transferee is fixed by G.S. 25-7-504(1) which provides: "A transferee of a document, whether negotiable or nonnegotiable, to whom the document has been delivered but not duly negotiated, acquires the title and rights which his transferor had or had actual authority to convey." Here Southeastern, the Bank's transferor, had no title by way of the fraudulent receipts to any grain held by Elevator, and it had no rights against Elevator. Woodcock, acting for and on behalf of Southeastern, had fraudulently procured the issuance of these receipts to Southeastern without the deposit of any grain. Then, as Southeastern's manager, he had pledged them to Bank in substitution of 16 previously issued receipts purportedly representing corn deposited in Elevator. However, at least six of these represented no grain at the time they were issued, and between the warehouse examiner's inspection of 10 February 1970 and May 1970,—without requiring the surrender of any receipts—Elevator had delivered to or for the account of Southeastern nearly 113,000 bushels of grain more than Southeastern allegedly had in storage there. Thus, Elevator had no obligation to deliver any grain to Southeastern, and it did not become obligated to Bank merely because Southeastern transferred the receipts.

[2, 3] The foregoing discussion analyses the Bank's rights and Elevator's liabilities under G.S. 25-7-502 and G.S. 25-7-504. The primary purpose of these two sections is to determine the priority of competing claims to valid documents and goods *actually* stored in a warehouse and to determine the issuer's liability for a misdelivery of goods *actually received* by it. Generally, a holder of negotiable warehouse receipts acquired through "due negotiation" will receive paramount title not only to the documents but also to the goods

represented by them, the purpose of U.C.C., Art. 7, Part 5, being to facilitate the negotiability and integrity of negotiable receipts.[1]

In situations where there are actual goods, and there are conflicting claims either to them or to the documents, G.S. 25-7-502, G.S. 25-7-503, and G.S. 25-7-504 determine the priority of these claims. In the present case, since the 13 receipts represented no grain in storage at the time of their issuance and no grain was subsequently acquired by the warehouseman, no question of who has paramount title to goods arises. The sole question is under what circumstances and to whom is an *issuer* liable for the issuance of warehouse receipts when it has not received the goods which the receipts purportedly cover? G.S. 25-7-203 covers this situation. It provides in pertinent part:

"A party to or purchaser for value in good faith of a document of title other than a bill of lading relying in either case upon the description therein of the goods may recover from the issuer damages caused by the non-receipt or misdescription of the goods, except to the extent that ... the party or purchaser otherwise had notice."

In the trial below, and in all their briefs submitted to this Court, the parties, overlooking G.S. 25-7-203, have proceeded on the theory that G.S. 25-7-502 and G.S. 25-7-504 govern this case. Furthermore, we did not consider this section in our first opinion.

[4]   The purpose of G.S. 25-7-203 is to protect specified parties to or purchasers of warehouse receipts by imposing liability upon the warehouseman when either he or his agent fraudulently or

---

1. A few examples will more fully explain the manner in which these sections are intended to work.

(1) An owner of goods (O) stores them in a warehouse, taking from the warehouseman negotiable receipts in bearer form. A thief (T) steals the bearer receipts and sells them to a holder who takes them through due negotiation. The holder acquires title to the receipts and to the goods represented by them and defeats O's claim to them. (G.S. 25-7-502(2).) If the purchaser for some reason did not acquire the receipts through due negotiation, or if the receipts were nonnegotiable, O would prevail against him. Similarly, assume O stores goods in a warehouse taking in return negotiable receipts made to a named person's order. Thereafter T steals them and transfers them to an innocent purchaser for value, forging the necessary indorsement. As between O and the innocent purchaser, O would prevail. The innocent purchaser could not be a holder through due negotiation under G.S. 25-7-502 and G.S. 25-7-501. Therefore, under G.S. 25-7-504 he would have only the rights and title to the document that his transferor had. Since his transferor was a thief having no title to the document, O would prevail against the innocent party.

(2) O stores his goods with warehouseman (W) who is not a merchant selling goods of that kind. Thereafter W, contrary to O's instructions, issued negotiable warehouse receipts which are ultimately duly negotiated to third-party (P). As between P and O, P would have title to the goods represented by the receipts. (G.S. 25-7-502, G.S. 25-7-503.) If P did not take by due negotiation he would have only the rights and title of his transferor and would not prevail against O (G.S. 25-7-504).

(3) Warehouseman (W) fraudulently issues negotiable receipts not covering goods actually in storage to third-party (P), who takes through due negotiation. Thereafter W acquires goods purportedly covered by the receipt. As against P, W is estopped from denying that he did not have title when the receipts were issued. G.S. 25-7-502(1)(c) and Comment thereto.

(4) Assume that a thief (T) steals goods from their owner (O) and stores them in a warehouse, taking negotiable receipts in return. T then negotiates the receipts to a purchaser (P) who takes through due negotiation. As between O and P, O has the superior right to the goods in the warehouse even though P took through due negotiation. G.S. 25-7-503. *See generally* J. White and R. Summers, Uniform Commercial Code 684-87 (1972).

mistakenly issues receipts (negotiable or nonnegotiable) for misdescribed or nonexistent goods. This section, coupled with the definition of issuer (G.S. 25-7-102(1)(g)), clearly places upon the warehouseman the risk that his agent may fraudulently or mistakenly issue improper receipts. The theory of the law is that the warehouseman, being in the best position to prevent the issuance of mistaken or fraudulent receipts, should be obligated to do so; that such receipts are a risk and cost of the business enterprise which the issuer is best able to absorb. *See* J. White and R. Summers, Uniform Commercial Code 690 (1972).

In the Comment to G.S. 25-7-203 it is said: "The issuer is liable on documents issued by an agent, contrary to instructions of his principal, without receiving goods. No disclaimer of the latter liability is permitted." *Issuer* is defined by G.S. 25-7-102 as "a bailee who issues a document. . . . Issuer includes any person for whom an agent or employee purports to act in issuing a document if the agent or employee has real or apparent authority to issue documents, notwithstanding that the issuer received no goods or that the goods were misdescribed or that in any other respect the agent or employee violated his instructions." Under these provisions Elevator would clearly be liable to the Bank on the 13 fraudulent receipts issued by its agent Woodcock *provided* the Bank could carry its burden of affirmatively proving that it came within the protection of G.S. 25-7-203.

Since G.S. 25-7-203 governs Bank's right to recover, under G.S. 25-1-103, the doctrine of agency and ratification discussed in our first opinion are "displaced".

We now consider whether the Bank qualifies for this protection. At the outset of our discussion we note that G.S. 25-7-203 contains no requirement that the purchaser take negotiable documents through "due negotiation" before he can recover from the issuer. (Compare this section with the analogous U.C.C. provision covering bills of lading, which provides protection to "a consignee of a nonnegotiable bill who has given value in good faith or a holder to whom a negotiable bill has been duly negotiated relying in either case upon the description. . . ." G.S. 25-7-301(1).) Of course, had the Bank met all the requirements of due negotiation it also would have met the requirements of G.S. 25-7-203.

[5]   To be entitled to recover under G.S. 25-7-203 a claimant has the burden of proving that he (1) is a party to or *purchaser of a document of title* other than a bill of lading; (2) *gave value* for the docu-

ment; (3) took the document in *good faith*; (4) *relied* to his detriment upon the description of the goods in the document; and (5) took *without notice* that the goods were misdescribed or were never received by the issuer. Many of these terms are defined in Article 1 of the U.C.C. (G.S. 25-1-201), and those definitions are also made applicable to Article 7. G.S. 25-7-102(4).

**[6]**    Under G.S. 25-1-201(33) and G.S. 25-1-201(32) Bank acquired the 13 negotiable warehouse receipts by purchase. Further, when Bank surrendered to Southeastern its old notes and the 16 receipts securing them, taking in return the new notes secured by the 13 receipts, it gave "value." Under G.S. 25-1-201(44) a person, *inter alia*, gives "value" for rights if he acquires them "(b) as security for or in total or partial satisfaction of a pre-existing claim . . . . or (d) generally in return for any consideration sufficient to support a simple contract." It now remains to determine whether Bank, at the time it relinquished the 16 old receipts in return for the 13 receipts, was acting (1) without notice that no goods had been received by the issuer for the 13 receipts, (2) in good faith, and (3) in reliance upon the descriptions in the receipts.

The trial court, after making detailed findings as to facts known to Bank at the time it accepted the 13 receipts, found and concluded the ultimate fact that "the plaintiff Bank did not receive warehouse receipts numbered 974 through 986 in good faith without notice of claims and defenses." This finding, although stated in the negative in order to use the precise language of G.S. 25-7-501(4), is equivalent to a positive finding that Bank took the 13 receipts with notice that they were spurious. On the same findings the judge also concluded that plaintiff did not come into court with "clean hands." This finding likewise is equivalent in import and meaning to a finding that Bank did not take the 13 receipts in good faith. *Trust Co. v. Gill, State Treasurer*, 286 N.C. 342, 364, 211 S.E. 2d 327, 342; 27 Am. Jur. 2d, *Equity* § 137 (1966); 30 C.J.S., *Equity* § 93 (1965). Upon these findings he held that plaintiff had no cause of action either at law or in equity based on the 13 receipts against either the State Warehouse Superintendent or against the State Treasurer as custodian of the State Indemnity and Guaranty Fund. We must, therefore, determine whether these findings are supported by competent evidence.

Upon our reconsideration of this case we have concluded (1) that the record evidence fully supports the trial judge's findings that Bank did not take the receipts in good faith and without notice

that they had been fraudulently issued and (2) that his findings compel his conclusions of law.

[7] " 'Good faith' means honesty in fact in the conduct or transaction concerned." G.S. 25-1-201(19). The absence of evidence that Bank's agents had themselves verified Elevator's shortage of grain or had eyewitness knowledge that the 13 receipts were fraudulently issued does not necessarily mean they did not *in fact* know, and it did not preclude a finding by the judge that Bank did not acquire the receipts in good faith and without notice of claims and defenses.

Under G.S. 25-1-201(25) a person, or corporation (G.S. 25-1-201(30), (28), (27)), has "notice" of a fact not only when he has actual knowledge of it, but also when "from all the facts and circumstances known to him at the time in question he has reason to know that it exists."

Good faith ("honesty in fact") and "notice," although not synonymous, are inherently intertwined. Therefore, the relation between the two cannot be ignored. "The same facts which call a party's 'good faith' into question may also give him 'notice of a defense.'" J. White and R. Summers, Uniform Commercial Code § 14-6 at 471 (1972). Certainly the power of a court under G.S. 25-1-201(25) to find notice when a holder or transferee "has reason to know" that something exists on the basis of the "facts and circumstances known to him" makes it "a short step from that definition to say that one 'knows' what a reasonable prudent man in his circumstances 'knows.'" *Id.* at 473. As pointed out in 1 R. Anderson, Uniform Commercial Code at 104 (1970), ". . . as a practical matter, it must be recognized that the circumstances may be such that the trier of fact will conclude that the person in question just could not have had a particular belief [good faith] because no reasonable man under the circumstances would have so believed."

[8] The crucial question in this case is whether, from all the facts and circumstances known to the Bank at the time it relinquished the 16 receipts to Southeastern in exchange for the 13 receipts, Bank had reason to know that Elevator had received no grain for them, for if it did, recovery is precluded. The voluminous evidence in this case permits the finding that the Bank did in fact have reason to know that the receipts were fraudulently issued and that it was not acting in good faith.

First, as the trial judge found (findings of fact Nos. 9 and 11) Bank was specifically informed of the manner in which Elevator was operated and fully alerted to Woodcock's dual agency as manager of

both Elevator and Southeastern. Furthermore, it was warned of the opportunity for fraud inherent in that situation. There is testimony to the effect that Parham met with officials of the Bank and Elevator and explained to them the mechanics of operating a grain elevator and the handling of warehouse receipts as collateral. Parham informed them Bank could protect itself from fraud by requiring all receipts pledged as collateral to show the number of the in ticket it purported to represent. The Bank followed this procedure until Brewer became manager of the Warsaw Branch at which time it was discontinued. Furthermore, the receipts themselves gave notice that Elevator's manager was also an officer of Southeastern.

Secondly, in May 1970, Bank was acutely aware of Southeastern's precarious financial condition. Yet it had continuously dealt with Southeastern in a manner inconsistent with sound banking practice as well as its own policies purporting to govern Southeastern's line of credit. On numerous occasions Southeastern's total outstanding indebtedness, as permitted by the Warsaw Branch, exceeded the line of credit authorized by Bank's home office. Furthermore, despite Bank's requirement that Southeastern furnish weekly inventory reports and additional financial information evidencing a satisfactory financial condition, the use of these safeguards was gradually discontinued and ultimately ignored.[2] As early as June 1969 the Warsaw Branch, for extended periods, consistently held Southeastern's checks for substantial sums when its checking account balance was insufficient to pay the checks.[3] Bank's home office required daily reports of any such retained items. However, the Warsaw Branch frequently failed to report these items. (The retention of these items, of course, amounted to interest-free advances to Southeastern above its already overextended credit line.) See Findings Nos. 12-15.

Finally Southeastern's requests on February 10, 1970 and May 6, 1970, the dates on which the warehouse examiner arrived at the Elevator for a routine inspection, that Bank refinance existing demand notes without increasing the indebtedness and exchange the warehouse receipts securing the old notes for new receipts, was so highly irregular as to provide notice that Elevator was short of grain; and Bank's acquiescence in these requests permits the finding that Bank's participation in these transactions was not in good faith.

2. For example, the report due on 31 May 1969 did not arrive until about November 15th. The first and only report received in 1970 came on 27 January 1970.

3. On 21 July 1969 the list of Southeastern's cash items held over included a check for $23,835.10 held since July 3rd. On 17 November 1969 cash items held over reached a high of $212,848.17.

On 9 February 1970 the United States Warehouse examiner arrived at Elevator for an inspection. He determined from its records that Elevator's total recorded obligation on warehouse receipts was 449,261 bushels, 320,000 bushels of which were covered by receipts to Southeastern. Southeastern, however, on February 10th, actually held receipts for 460,000 bushels, which had been pledged to Bank to secure six notes totaling $165,760.00. These receipts represented 140,000 more bushels than the Elevator's records showed. In order to keep the examiner from learning that Southeastern had obtained grain without surrendering warehouse receipts, Woodcock signed and had his secretary, Mrs. Carlton, deliver to Bank a check for $165,760.00. On that day Southeastern's bank balance was $104,751.82. However, in spite of insufficient funds to pay the check, the Warsaw Branch under Brewer's management released to Southeastern nine warehouse receipts representing the 140,000 bushels of corn previously delivered to Southeastern. The word "Hold" was placed on Southeastern's checking account ledger sheet by the balance to indicate that no further checks would be charged to the account.

The nine warehouse receipts thus obtained were presented to the examiner as an oversight and he stamped them canceled on February 10th. This cancellation "left the warehouse temporarily in a favorable position." On February 12th, after the examiner had left the Elevator, Southeastern delivered a new note for $71,040.00 to Bank along with six new warehouse receipts (Nos. 962-967) for 60,000 bushels of yellow corn. Elevator had received no new corn to support these new receipts. This deposit made Southeastern's check for $165,760.00 good and the notes for that amount which had been secured by the previously surrendered receipts were then marked paid.

Brewer testified that he could not explain how warehouse receipts for 140,000 bushels were released by the Warsaw Branch on February 10th and canceled by the warehouse examiner when the notes secured by them had not been paid by a check drawn on sufficient funds in the bank to cover the check. Each of the Bank's employees who had authority to release collateral denied any recollection of having released the nine warehouse receipts which Mrs. Carlton obtained from Bank on February 10th.

Brewer also testified that during March and April 1970 Bank's records showed that Southeastern ordered 300,932.85 bushels of grain to be shipped on bills of lading and that during this period Southeastern had pledged with the Bank warehouse receipts to

secure approximately $400,000.00 in loans. *Inter alia*, he said: "I cannot answer your question, 'Did you ever suggest to Mr. Woodcock that he might sell the grain in the warehouses and pay us off, rather than get it from outside?' I cannot answer your question, 'Did it arouse any suspicion in your mind that he was ordering grain from outside, at a time when you were trying to get your money, and not selling the grain he had in his warehouse to pay you off?' "

On the afternoon of 5 May 1970, Mr. L. L. Brown, a United States Warehouse Examiner, arrived at the Elevator to make a periodic check of the grain storage operation. Woodcock knew he did not have enough grain in storage to pass inspection, and Southeastern's checking account contained only enough money to cover "the loan value plus interest" on two of its receipts pledged to the bank, Nos. 951 and 953. After Brown had started his inspection Woodcock prepared and signed a check in the amount of $83,625.92, dated 5 May 1970. With this check Mrs. Carlton procured the two receipts numbered 951 and 953.

Soon after the beginning of work on May 6th Brown asked Mrs. Carlton for the canceled warehouse receipts. She gave him all she had on hand, including Nos. 951 and 953. Shortly thereafter Woodcock left for the bank.

On the morning of 6 May 1970 Bank held demand notes against Southeastern in the amount of $544,424.00, on which the sum of $338,224.00 was due. This figure represented the face amount of three demand notes dated respectively 6 January 1970, 12 February 1970, and 8 April 1970 and the balance due on two demand notes, each dated 5 January 1970. The last four notes were secured by the 16 warehouse receipts which Elevator had issued to Southeastern and which then represented no corn in storage. These receipts were Nos. 954-958, 962-967, 969-973.

On 6 May 1970, in the absence of Brewer, who was away on naval reserve training, C. C. Rouse, the general operations and business loans manager, was in charge of Bank's Warsaw Branch. Rouse had been employed by Bank for 23 years, the last 17 at the Warsaw Branch. Rouse's testimony, summarized except when quoted, tends to show: On 6 May 1970, shortly after the bank opened at 9:00 a.m., Woodcock came in. "He stated that he had the Warehouse Examiners in his office and that he wanted to have us release all the warehouse receipts showing yellow corn . . . that he wanted to take these receipts to the examiners for his inspection with the possibility of working out a change in the method of issuing

these receipts, and that he would — expect within a day or two suffi-
cient funds — collections to pay the notes that these receipts . . .
secured."

Woodcock's request being "a little more than [he] would care to
handle," Rouse called Vice-President Bateman at the home office in
Wilson for instructions. In consequence, he told Woodcock he would
not release the receipts until the notes they secured were paid.
Woodcock's reply was, "Well, I'll make other arrangements." About
11:00 a.m. Woodcock returned to the bank "and made a proposal and
request that he be permitted to issue new warehouse receipts along
with notes and deposit it with the bank which would generate suffi-
cient funds to pay off the notes, and of course release the collateral
on the notes that the bank was at that time holding."

Rouse again called Bateman and reported Woodcock's proposal
to him. "Mr. Bateman responded that if it would appear that
everything was in order in the way of issuing new receipts, and that
we will follow the prescribed procedure that we had followed in the
past, *and that it was not going to increase the loans outstanding*,
and that the existing loan with the bank would be paid off, he would
have no objections to [Rouse] handling it.[4] And with this [Rouse] was
back in touch with Mr. Woodcock and told him that [they] would be
able to handle it in this way. Mr. Woodcock suggested that we issue
receipts in an even amount, uniform amounts of 20,000 bushels per
receipt." (Emphasis added.)

Woodcock returned to his office and, pursuant to his instruc-
tions, Mrs. Carlton prepared (a) a check for $328,952.00, which
covered the loan value of the 16 receipts held by the Bank; (b) two
demand notes for $165,760.00 and $142,080.00 respectively (these
notes had previously been signed in blank by Southeastern's
president); (c) a deposit slip in the amount of $307,840.00 (the sum of
the two notes); and (d) 13 new warehouse receipts (Nos. 974-986) for
20,000 bushels of yellow corn each.

In preparing these receipts Mrs. Carlton erroneously showed
the poundage on each as 112,000 pounds instead of 1,112,000 pounds.

After having procured Woodcock's signature to the documents,
Mrs. Carlton delivered them to Bank's note teller, Mrs. Walker. At
that time, Rouse asked Mrs. Carlton why the old receipts were be-

---

4. In this connection it is also relevant to recall that on the last prior occasion of an examiner's presence in
town a similar incident of renewing demand notes and substituting new warehouse receipts for old had occurred.
With reference to these renewals Brewer testified, "I can't determine why a demand note would be renewed by a
demand note. It's completely unusual . . . I never recall a bank renewing a demand note, and I never recall renew-
ing a demand note, but I guess we did it. There's no reason to renew a demand note."

ing canceled and new ones issued. She replied that she did not know that Woodcock had told her to do it. Mrs. Walker then gave her the old receipts in return for the check for $328,952.00. However, she kept the old notes in order to figure the interest for collection. Mrs. Carlton returned to her office, canceled the 16 receipts and immediately informed Brown that she "had found an additional 16 receipts." Shortly after lunch Mrs. Walker called to say that Woodcock had not indorsed the 13 new warehouse receipts. Mrs. Carlton returned to the Bank and stamped the name "Southeastern Farmers Grain Association, Inc." on the back of each of the 13 receipts. Woodcock told Mrs. Carlton he would go to the Bank and indorse the receipts that afternoon or the next morning, but never did. No explanation for Bank's failure to note the errors and absence of indorsement before accepting the new receipts in substitution for the old was attempted.

On May 7th Mrs. Walker called to say that the interest on the notes covered by the 16 surrendered warehouse receipts was $3,393.20. Accordingly Mrs. Carlton prepared a check for that amount, Woodcock signed it, and she delivered it to the Bank.

Although Woodcock's substitution of demand notes and warehouse receipts as collateral had been sufficient to cover up Elevator's shortage in February, it was insufficient in May. On May 7th the warehouse examiner discovered both the shortage and that the spurious 13 receipts were missing from the receipts book. (For further details of this discovery see *State v. Woodcock*, 17 N.C. App. 242, 193 S.E. 2d 759 (1973).)

The evidence recapitulated above should remove any lingering doubt that the record fully supports the trial judge's findings and conclusion that Bank did not take the 13 warehouse receipts in good faith and without notice that corn had not been received for them. It overtaxes credulity to accept plaintiff's contention that experienced bankers could have lacked notice of Woodcock's fraud. Measured by any acceptable standard of banking or business judgment, the reasons which Woodcock gave Bank on the morning of May 6th for wanting to obtain the 16 old receipts were so improbable that, under all the circumstances, its officers "must have known" there was a shortage of grain at the Elevator. (*Cf. State v. Oxendine*, 223 N.C. 659, 661, 27 S.E. 2d 814, 815 (1943), which discusses the test of knowledge required to carry a case to the jury on the issue of receiving stolen goods.)

It would appear that the Bank officials acquiesced in Woodcock's request because they erroneously believed that so long as

they did not themselves actually verify a shortage, Bank was protected by the statement on each of the 13 receipts in suit that, "The State of North Carolina guarantees the integrity of this receipt." Certainly Bank's conduct engenders the strong inference that it wilfully failed to seek actual knowledge as to why Southeastern wanted to substitute notes and receipts because of the well-founded belief that an inquiry would disclose that the new receipts represented no grain in Elevator. The trial judge, who heard the voluminous evidence in this case without a jury, and carefully considered and unraveled the complications which resulted from Woodcock's dual agency, came to that conclusion. There being ample evidence to support his findings and conclusions we are not at liberty to disturb them. *Young v. Insurance Co.*, 267 N.C. 339, 148 S.E. 2d 226 (1966).

[9]   Albeit "good faith" is literally defined as "honesty in fact in the conduct or transaction concerned," G.S. 25-1-201(19), the Uniform Commercial Code (G.S. 25-7-203 and G.S. 25-1-201(25)) does not permit parties to intentionally keep themselves in ignorance of facts which, if known, would defeat their rights in a negotiable document of title. *See Winter & Hirsch, Inc. v. Passarelli*, 122 Ill. App. 2d 372, 259 N.E. 2d 312 (1970). Nor will it allow Bank to recover losses which it received through its participation in Woodcock's fraudulent efforts to cover up Elevator's grain shortages.

It follows from the trial judge's findings that Bank was in *pari delicto* with Woodcock in this attempt. To permit recovery under the facts found would be *contra bonos mores*. The doctrine which bars a party's right to recover in an action grounded on his own fraud "is based on the principle that to give plaintiff relief in such case would contravene public morals and impair the good society." 37 Am. Jur. 2d, *Fraud and Deceit* § 303 (1968). *See* 17 Am. Jur., *Contracts* § 222 (1964); *Lawrence Warehouse Co. v. Dove Creek State Bank*, 172 Colo. 90, 470 P. 2d 838 (1970).

[10]   The Code was not designed to permit those dealing in the commercial world to obtain rights by an absence of inquiry under circumstances amounting to an intentional closing of the eyes and mind to defects in or defenses to the transaction. *See General Investment Corp. v. Angelini*, 58 N.J. 396, 278 A. 2d 193 (1971). Nor did the General Assembly, when, by G.S. 106-435, it created the State Indemnifying and Guaranty Fund to safeguard the State Warehouse System and to make its receipts acceptable as collateral, intend that it should encourage individuals or financial institutions to engage in transactions from which they would otherwise have

recoiled. On the contrary, the fund was created to protect those parties to or purchasers of warehouse receipts who, acting in good faith and without reason to know that the goods described thereon are misdescribed or nonexistent, suffer loss through their acceptance or purchase of the receipt. *Lacy v. Indemnity Co.*, 189 N.C. 24, 126 S.E. 316 (1925).

The case comes down to this: Plaintiff Bank based its right to recover on the 13 fraudulent warehouse receipts numbered 974-986 for which Elevator received no grain. Its action, if any, was under G.S. 25-7-203. Therefore, if plaintiff could prove it acquired the receipts in good faith and without notice of the fraud, it was entitled to recover; otherwise, not. The trier of facts, upon sufficient evidence, found that plaintiff did not acquire the receipts in good faith and without notice.

The judgment of the trial court is therefore affirmed as to all defendants and our former decision as reported in 286 N.C. 342, 211 S.E. 2d 327 (1975) is withdrawn.

Affirmed.

Justice COPELAND did not participate in the hearing or decision of this case.

Justice LAKE dissenting.

On 31 January 1975, this Court, without a dissenting vote, held the Bank entitled to recover from the defendant Gill, as Custodian of the State Indemnity and Guaranty Fund, and from the defendants Woodcock and Insurance Company of North America, the surety on Woodcock's fidelity bond, the liability of Woodcock and his surety being primary and that of the State Indemnity and Guaranty Fund secondary. *Trust Co. v. Gill, State Treasurer*, 286 N.C. 342, 211 S.E. 2d 327.

Today, after nearly three years of further consideration and research, the present majority opinion "withdraws" that decision without finding a single legal principle stated therein erroneous and affirms the judgment of the Superior Court. Thus, this Court now holds, not only that the Bank cannot recover from the State Indemnity and Guaranty Fund, but cannot even recover from Woodcock, the actual perpetrator of the fraud, and the surety on his bond.

A judgment against Woodcock, himself, may or may not presently be uncollectible, but the Bank is entitled to it and to pur-

sue its remedy against his surety. The majority opinion speaks repeatedly, and correctly, of Woodcock's fraud in issuing the warehouse receipts for which the Elevator had received no grain. Whom did Woodcock defraud? The Bank, of course. He issued the receipts for the purpose of having them delivered to the Bank in exchange for then outstanding receipts held by the Bank, the validity of which such other receipts in the hands of the Bank is unquestioned. That purpose was accomplished and those previously outstanding receipts Woodcock caused to be cancelled. Thus, the Bank was damaged by Woodcock's fraud. Yet the majority opinion holds, *it cannot even recover from Woodcock.* It is elementary that one damaged by fraud perpetrated upon him by another may recover his damages from such fraudulent party. *Brooks v. Construction Co.*, 253 N.C. 214, 116 S.E. 2d 454 (1960); *Buick Co. v. Rhodes*, 215 N.C. 595, 2 S.E. 2d 699 (1939); *Frick Co. v. Shelton*, 197 N.C. 296, 148 S.E. 318 (1929).

Of course, it is true that where parties to a transaction are *in pari delicto* neither can recover from the other. *Bledsoe v. Lumber Co.*, 229 N.C. 128, 48 S.E. 2d 50 (1948); *Byers v. Byers*, 223 N.C. 85, 25 S.E. 2d 466 (1943); *Bean v. Detective Co.*, 206 N.C. 124, 173 S.E. 5 (1934). However, the majority opinion does not say the Bank was *in pari delicto* with Woodcock, but only that it was so careless it must be deemed to have taken the wrongfully issued receipts in bad faith. Woodcock, himself, testified the Bank *did not know* there was not enough grain in the Elevator to support the receipts at the time they were delivered to the Bank. There was no testimony in conflict with this statement by him. As I shall show below, the surrounding circumstances compel the conclusion that the Bank did not know the new receipts were spurious when it received them. Exceedingly gullible the employees of this local branch of the Bank may have been (and I think they were), but there is no evidence whatsoever which would support a finding that the Bank was *in pari delicto* with Woodcock. Thus, the Bank, having been damaged by Woodcock's wrongful issuance of the receipts (for which he has served a prison sentence) and his fraudulent transfer of them to the Bank in exchange for receipts valid in the hands of the Bank, is clearly entitled to recover from Woodcock and the surety on his bond and, to this extent, at least, the Superior Court was in error and so is the present majority opinion.

Let us turn now to the more important question — the right of the Bank to recover from the State Indemnity and Guaranty Fund. It is my opinion that the present decision results in injustice and

throws the law into confusion by ignoring the established principle of law to the effect that a principal for whose benefit an agent acts without authority ratifies the act and is bound thereby if, with knowledge of the improper act of the agent, he accepts the benefit obtained for him thereby by the agent. That was the basis for our former decision. In my view, it still requires that result in this case. The present majority opinion does not mention the law of ratification or show its inapplicability to this case.

The Elevator and the Southeastern Farmers Grain Association, Inc. (hereinafter called Southeastern), are two distinct and separate entities. The Elevator, a unit of the State Warehouse System, was the warehouseman, Woodcock its agent. The Elevator was short of grain with which to meet then outstanding receipts valid in the hands of their holders. Consequently, the Elevator was faced with forced closure. Solely for the purpose of avoiding this, Woodcock issued, without authority, receipts for non-existent grain. These he caused to be transferred to the Bank, receiving in exchange previously issued receipts *valid in the hands of the Bank*. He then cancelled those previously issued receipts. That discharged the Elevator's liability *on those receipts*.

Now, the Elevator (the State Indemnity and Guaranty Fund) says to the Bank, in effect: "We are not liable to you on the new receipts because they were issued without authority and we are not liable to you on the old receipts, which our agent procured from you in exchange for the new ones, because we have cancelled them." This the Elevator cannot do, because when, with full knowledge of Woodcock's acts, it took back and cancelled the previously outstanding receipts, the Elevator ratified Woodcock's issuance of the new ones on which the Bank now claims. Thus, the liability of the Elevator (and the State Indemnity and Guaranty Fund) is the same as it would be if Woodcock had been expressly authorized by the Elevator to issue the receipts upon which the Bank now claims.

In their petition for rehearing, the defendants assert two grounds for reconsideration and reversal of our original opinion. First, they assert that our original opinion is in conflict with G.S. 25-7-504, a provision of the Uniform Commercial Code, in that, in disregard of the Official Comment upon that section of the Code, we applied "the doctrine of equitable estoppel" to "enlarge the rights of a transferee [without due negotiation] of a document of title beyond the rights provided by G.S. 25-7-504." Second, they assert that our original opinion impairs the commercial usefulness of warehouse

receipts by exposing the holder to the risks of equities in favor of others.

The present majority opinion does not refer to or rest upon either of these two asserted grounds for withdrawing our former decision. In this, the present majority opinion is correct, for each of these bases on which rehearing was sought and allowed is completely unsound.

The latter of the defendants' contentions is patently without any semblance of foundation in fact or law. How could the commercial usefulness of warehouse receipts be impaired by a decision permitting a transferee thereof to enforce such a receipt against the warehouseman? It is the present majority opinion, not our former decision, which impairs the commercial usefulness of warehouse receipts, but that circumstance, in and of itself, is not the basis of my dissent.

An examination of our former opinion will disclose the defendants' other asserted ground for its reconsideration and withdrawal is equally without any foundation. Our former opinion makes no reference whatever to estoppel except a single statement to the effect that *the Bank asserted* that the Elevator was "estopped to challenge the validity of the 13 new receipts in the hands of the Bank." No reference whatever appears in our former opinion to any principle of equity except with respect to the right of the Bank to obtain reformation of the receipts for a mistake in the drafting thereof, a matter relating only to the amount of the Bank's recovery, not to its right to proceed against the warehouseman, and so against the State Indemnity and Guaranty Fund, and a matter not reached or dealt with in the present majority opinion. Our former decision, that the Bank can so proceed successfully, was placed neither on the ground of estoppel nor on principles of equity but on the ground of ratification by the warehouseman of an act of its agent through acceptance by the warehouse of benefits derived therefrom with knowledge of the circumstances. Ratification by a principal of an unauthorized act of his agent is, of course, a doctrine of the common law, not of equity.

The Uniform Commercial Code provides in G.S. 25-1-103:

"*Supplementary general principles of law applicable.—* Unless displaced by the particular provisions of this chapter, the principles of law and equity, including the law merchant and the law relative to capacity to contract, *principal and*

*agent*, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." (Emphasis added.)

It has been said that this section "is probably the most important single provision in the Code." White and Summers, Uniform Commercial Code (1972), § 1, p. 6.

The right of the Bank to recover from the Elevator (the warehouseman), and so from the State Indemnity and Guaranty Fund, does not stem from the transfer of the 13 new receipts to the Bank by Southeastern, which transfer was otherwise than by due negotiation. It stems from what the Elevator did after that transfer—the acceptance by the Elevator from its agent, Woodcock, of the old receipts (previously held by the Bank and valid in its hands) and its cancellation of those receipts with full knowledge of how its agent, Woodcock, obtained them from the Bank. It is this act of the warehouseman which lifts the right of the Bank under the new receipts above the right thereunder of its transferor, Southeastern. Neither G.S. 25-7-504 nor the Official Comment thereto (relied upon by the defendants in their petition for rehearing, though not by the present majority opinion) is in conflict with our original decision that a warehouseman, who, after such a transfer of a receipt, issued by his agent without authority, accepts, with full knowledge of the circumstances, the proceeds of the previously unauthorized receipt, thereby ratifies the issuance of the receipt and becomes liable thereon to the transferee. The Uniform Commercial Code does not deal with that situation. Consequently, as the Code expressly provides in G.S. 25-1-103, "The principles of law and equity, including * * * principal and agent * * * supplement its provisions" and provide the rule for the decision of this controversy.

Clearly, as we held in our former decision, the Superior Court's Finding of Fact Number 41 is not supported by the evidence. That Finding (summarized) is:

41. The plan whereby Southeastern delivered to the Bank the 13 new, fraudulent warehouse receipts in exchange for the surrender by the Bank of the 16 old warehouse receipts was not intented to and did not in fact promote the interest of the Elevator. Since Southeastern had already caused the grain represented by these receipts to be delivered by the Elevator, Southeastern was obligated to surrender the receipts for cancellation and when the Elevator obtained possession of such

receipts "it had a perfect right to cancel them on its records." The Elevator did not benefit from the cancellation of these receipts.

On the contrary, the Elevator, and the Elevator alone, was intended to be benefited and was benefited by the consummation of Woodcock's fraud on the Bank. Southeastern's obligations were not diminished one particle. It is not contended that the 16 old receipts, now cancelled, were not held by the Bank by due negotiation. Therefore, in the hands of the Bank, these were valid, enforceable obligations of the Elevator to deliver grain, irrespective of the fact that the Elevator had already shipped out all the grain represented thereby. Consequently, while the Bank held those receipts, the Elevator's delivery of such grain gave it no right whatever to cancel those receipts. Those receipts were obtained from the Bank by Woodcock's fraud. With full knowledge of this fraud, the Elevator accepted the receipts so obtained and cancelled them, thus eliminating its previous obligation to deliver grain upon their presentment. This is Woodcock's uncontradicted testimony on that point:

> "[Mrs. Carlton] was instructed to deliver this check to Branch Banking and Trust Company on May 6, 1970, to pick up sufficient warehouse receipts, or a number of warehouse receipts. To pick up a quantity of receipts to cancel for the Warehouse Examiner. The purpose of having her pick up these receipts and having them cancelled for the Warehouse Examiner was as related in the statement I just read. The Examiner was there and we needed them for his audit. We needed them for his audit because the warehouse was short of grain. *If we could cancel the receipts that would reduce the amount of grain that the Elevator was charged as having outstanding.*" (Emphasis added.)

Contrary to the finding and conclusion of the Superior Court, the Elevator had, as against the Bank, no right whatsoever to cancel the old receipts, except through ratification of Woodcock's issuance of the new receipts for delivery to the Bank in lieu of the old ones. Thus, as between the Bank and the Elevator, the new receipts must be deemed authorized by the Elevator and its binding obligations to deliver grain.

The State Warehouse Superintendent signed each of these new receipts in blank before it was filled out and completed and, in this condition, turned it over to Woodcock, thus putting it in the power

of Woodcock to complete the receipt and issue it when and as Woodcock saw fit to do so. While I do not rest my dissent on this circumstance, I am constrained to observe that it was this action of the State Warehouse Superintendent in entrusting these receipts, so signed in blank by him, to the local manager of the warehouse, known by the Superintendent to be also the managing officer of an association whose business was the buying and selling of grain, to which association the warehouse manager habitually issued receipts purporting to represent grain stored in the warehouse, which made it possible for these receipts to be issued by Woodcock when no grain had been deposited in the Elevator. It would hardly be surprising if a continuation of such careless practice by the State Warehouse Superintendent should result in continuing depletions of the State Indemnity and Guaranty Fund. For reasons best known to itself, certainly not understood by me, the Bank elected to abandon its appeal from the judgment denying it any recovery from the State Warehouse Superintendent and the surety on his bond, so that question is not presently before us.

Each of these receipts, so signed by the State Warehouse Superintendent and by Woodcock, states upon its face, "*The State of North Carolina guarantees the integrity of this receipt.*" What does that mean? Surely, the integrity of the receipt means that the Elevator has received and holds the grain described therein and will hold it until the receipt is presented to it by the holder thereof and will thereupon deliver that grain pursuant to the holder's direction. That the State of North Carolina guaranteed. That is the guaranty the Bank is suing to enforce.

G.S. 106-435 created the State Indemnity and Guaranty Fund. G.S. 106-441 provides, "[T]he receipts issued under this section for cotton and other agricultural commodities shall be supported and guaranteed by the indemnity fund provided in § 106-435." Thus, the extent of the State's guaranty of the "integrity" of these receipts is the right of recourse to the said fund. That is all the Bank seeks in this case. As we said in our former decision, the State's liability upon this guaranty is secondary to the liability of the Local Manager of the Warehouse (Woodcock) and that of the State Warehouse Superintendent and the sureties on their bonds. See: *Ellison v. Hunsinger,* 237 N.C. 619, 75 S.E. 2d 884 (1953); *Lacy v. Indemnity Co.,* 193 N.C. 179, 136 S.E. 359 (1927); *Lacy v. Indemnity Co.,* 189 N.C. 24, 126 S.E. 316 (1925). Obviously, it is also secondary to the liability of the warehouseman (the Elevator).

The Uniform Commercial Code, G.S. 25-7-203, provides-

> "*Liability for non-receipt or misdescription.*— A party to *or a purchaser for value in good faith* of a document of title other than a bill of lading relying in either case upon the description therein of the goods may recover from the issuer damages caused by the *non-receipt* or misdescription of the goods [with specified exceptions not applicable to the present case.]" (Emphasis added.)

The Official Comment upon this section of the Code states:

> "The issuer is liable on documents issued by an agent, contrary to instructions of his principal, without receiving goods. *No disclaimer of the latter liability is permitted.*" (Emphasis added.)

In White and Summers, Uniform Commercial Code, § 20-4, p. 690, it is said:

> "When one reads [§ 7-203] together with the Code definition of issuer, the Code imposes liability for nonreceipt on a warehouseman 'for whom an agent or employee purports to act in issuing a document if the agent or employee has real or apparent authority to issue documents, notwithstanding that the issuer received no goods.' (§ 7-102(1)(g)). This is a salutary departure from pre-Code law in such states as Massachusetts which permitted the issuer to escape liability for nonreceipt where the issuer's agent, having authority to issue receipts, issued a receipt for goods not delivered. It should be noted, too, that the warehouseman's liability runs only to 'a party or purchaser for value in good faith of a document of title * * * relying in either case upon the description therein.' "

I think it obvious that the State's guaranty of the "integrity" of the 13 receipts now held by the Bank is not intended to extend to Southeastern, the party to whom they were issued, for Southeastern necessarily knew no grain had been delivered by it, or for its account, to the Elevator. I think it equally obvious that the State's guaranty of the "integrity" of these receipts is not intended to extend to a transferee of them, if that transferee did not purchase them for value and in "good faith," as that term is used in the Uniform Commercial Code, but it does extend to a transferee of these receipts if the transferee purchased them for value and in "good faith," as that term is used in the Code.

Clearly, the Bank purchased these 13 receipts for value, having surrendered to Southeastern in exchange therefor 16 other receipts the validity of which, in the hands of the Bank, has never been questioned. Thus, the right of the Bank to recover from the State Indemnity and Guaranty Fund on account of these 13 receipts depends upon whether the Bank took them "in good faith," as that term is used in the Uniform Commercial Code. The present majority opinion holds the Bank did not do so. This is where I respectfully part company with the present majority so far as the Bank's right to recover from the State Indemnity and Guaranty Fund is concerned.

It should be observed that the liability imposed by the Uniform Commercial Code (G.S. 25-7-203) upon the warehouseman (the Elevator), and so upon the State as guarantor of the "integrity" of the receipt, when the receipt was issued without any such goods being deposited in the warehouse, runs to "a purchaser for value in good faith." *This section of the Code does not require that such purchaser take by "due negotiation"*; i.e., that he be an indorsee of the receipt. The Code, itself, defines "good faith" as that term is used throughout the Code. It expressly states: " 'Good faith' means honesty in fact *in the conduct or transaction concerned.*" (Emphasis added.) G.S. 25-1-201(19).

Woodcock testified that the Bank did not know the Elevator was short on corn when the arrival of the State Inspector precipitated his fraudulent issuance of these receipts. A careful study of the voluminous record has revealed to me no testimony of any witness to the contrary. Woodcock's testimony is strongly corroborated by the circumstances.

The record clearly shows these circumstances:

(1) The "transaction concerned" began with the unexpected arrival of the State Inspector at the Elevator on 5 May 1970. Nothing indicates it was contemplated earlier, even by Woodcock, certainly not by the Bank.

(2) At that time the Elevator did not have in its facilities enough grain to meet its previously issued and outstanding receipts. Woodcock knew this. The Bank did not.

(3) From 10 February 1970 to 5 May 1970, the Elevator had delivered, pursuant to Southeastern's directions, huge quantities of grain, for which receipts were outstanding, without requiring surrender of such receipts. Woodcock knew this. The Bank did not.

(4) The Elevator was a unit of the State Warehouse System. It engaged in no other business. It did not buy and sell grain. Southeastern was its principal customer. It does not appear that the Elevator was indebted to the Bank or was a customer of the Bank.

(5) For many months prior to 5 May 1970, the Bank, acting through Craven Brewer, Manager of its local branch, conducted banking transactions with Southeastern with an amazing degree of laxity and disregard of what would seem to be elementary principles of good banking, permitting huge overdrafts to remain unpaid for long periods of time and making very large loans in addition. Thus, the Bank knew Southeastern—not the Elevator—was in a precarious financial condition. These banking transactions are not, however, the "transaction concerned."

(6) On 5 May 1970, when the "transaction concerned" was precipitated by the arrival of the inspector at the Elevator, Southeastern—not the Elevator—was indebted to the Bank on its notes in the total amount of $545,424. *There were then no overdrafts.* These notes were secured by pledges by Southeastern of receipts issued by the Elevator, which receipts the Bank had acquired by due negotiation and which were, therefore, valid and enforceable by the Bank against the Elevator and the State Indemnity and Guaranty Fund. Nothing whatever indicates that the security so held by the Bank was not fully adequate to cover these notes.

(7) When the "transaction concerned" began, and throughout it, Craven Brewer, who had conducted the previous transactions with Southeastern, who had permitted the former overdrafts (eliminated prior to the "transaction concerned") and who had made the loans represented by the notes so held by the Bank, was absent on military duty.

(8) The Bank refused to permit Woodcock to take "for the inspector's examination" the receipts it then held, until the notes they secured were paid, and refused to accept another overdraft in payment of the notes.

(9) Thereafter, the Bank surrendered to its customer (Southeastern) the receipts of the Elevator, previously so pledged to the Bank, in exchange for Southeastern's new note and the pledge of 13 new receipts issued by the Elevator. This is the "transaction concerned." According to Woodcock's uncontradicted testimony, the Bank did *not* then know the Elevator was short of grain.

(10) Southeastern surrendered the receipts it so obtained from the Bank to the Elevator, which cancelled them with full knowledge as to how they were obtained from the Bank.

(11) The Bank, by the "transaction concerned," had no purpose to improve its own position and could not possibly have done so. Prior thereto, the Bank held notes, fully secured, of a debtor it knew to be in precarious financial condition. It knew of no shortage at the Elevator. It surrendered those papers in exchange for like notes, secured, as it thought, by like receipts of like validity. Had the new receipts been supported in full by grain in the Elevator, the Bank's position would not have been one whit better than it was prior to the "transaction concerned." The Bank's sole apparent purpose was to accommodate its customer (Southeastern) without changing, in the slightest degree, its right to payment of the latter's indebtedness to it or the security it held therefor.

I see in these facts no indication that the Bank lacked "*honesty in fact* in the transaction concerned" — the only requirement, according to the express provision of the Uniform Commercial Code, for its qualification as a purchaser "in good faith" of the 13 new receipts.

This Court has the advantage of three years' perusal and re-perusal of hundreds of pages of testimony. The local employees of the Bank, who handled the "transaction concerned," did so in connection with their other duties, in a short space of time during a single banking day. Looking backward, we see Woodcock has been convicted of criminal fraud in the "transaction concerned." That morning, however, he was a respected businessman in the community and was so regarded by the employees of the Bank. We now know the Elevator was short of grain at the time of the "transaction concerned." Woodcock testified the Bank's employees did not know that. Looking backward, it is apparent they were gullible, but most victims of fraud are gullible, at least at the time of the fraud, and gullibility is not *dishonesty in fact*. Only lack of "honesty in fact" by its employees will prevent the Bank from being a purchaser of these receipts "in good faith," and so justify denial of the Bank's recovery from the State Indemnity and Guaranty Fund.

Surely, the Bank's local manager, Brewer, had been exceedingly lax in his conduct of past banking transactions with Southeastern, but those overdrafts had been paid when the "transaction concerned" took place — in Brewer's absence.

To be sure, one who wilfully shuts his eyes so that he will not see fraud by a transferor of commercial paper (or other property)

cannot thereby qualify as a purchaser "in good faith," but I see no evidence of the Bank's employees so shutting their eyes when they exchanged papers with Southeastern's emissary. That situation is usually found where the purchaser is seeking to grasp for himself an advantage, as where he seeks to buy something for far less than its true value and for fear of losing a good bargain shuts his eyes to its history. As above noted, in the "transaction concerned," the Bank would not have gained anything whatever by the exchange had the Elevator been bursting at its seams with corn.

The majority opinion speaks of credulity. In my view, to conclude that a bank, holding the note for more than $500,000 of a debtor it knows to be in precarious financial condition, which note is fully secured by a pledge of warehouse receipts completely enforceable by the bank, would, without any purpose or hope of gain thereby, give up that security in exchange for receipts it knows to be spurious, or even suspects to be spurious, taxes credulity beyond the breaking point. The circumstances of the exchange of the valid, old receipts for the spurious new ones fully corroborate, in my judgment, Woodcock's uncontradicted testimony that the Bank did *not* know the Elevator was short of grain.

The majority's present decision enables Woodcock, the defrauder, and his surety to go free of liability and the State to renege on its express guaranty of the "integrity" of these receipts. It prevents a purchaser for value and in good faith of the guaranteed receipts from reaching the Indemnity and Guaranty Fund which was set up for this very purpose. I, therefore, am of the opinion that we should adhere to our former decision.